Stuart M. Eppsteiner, Esq. (SBN 098973)
sme@eppsteiner.com
Andrew J. Kubik, Esq. (SBN 246902)
ajk@eppsteiner.com
**EPPSTEINER & FIORICA ATTORNEYS, LLP**
12555 High Bluff Dr., Suite 155
San Diego, California 92130
T: 858-350-1500
F: 858-350-1501

Counsel for Plaintiff and the Putative Class

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLAS WOOD, individually and on behalf of all others similarly situated,<br><br>PLAINTIFF,<br><br>vs.<br><br>BBG COMMUNICATIONS, INC.,  BBG GLOBAL AG, and DOES 1-10 INCLUSIVE,<br><br>DEFENDANTS. | CASE NO.: 3:11-cv-00227-AJB-NLS<br><br>CLASS ACTION<br><br>**FIRST AMENDED COMPLAINT**<br><br>[Demand For Jury Trial] |

Plaintiff Nicolas Wood, by and through his undersigned counsel, individually and on behalf of  all others similarly situated, alleges facts and claims upon personal knowledge and information and belief as follows:

## INTRODUCTION

1.     This complaint alleges that BBG Communications, Inc., and BBG Global AG, (collectively "BBG" or "Defendants"), as a result of conduct emanating and omissions and misrepresentations disseminated from BBG's California headquarters, failed to disclose material information to Plaintiff, and those similarly situated, in relation to their purchase of Defendants' telecommunications services.

163120

2.      Specifically, BBG fails to disclose significant connection fees, extraordinarily high per-minute long distance telephone rates, and/or minimum charges for unconnected calls on or through the public and/or private telephones it services at airports, train stations, cruise-ship ports, hotels, and other locations throughout the world.

3.      No state or federal regulatory agency has either authorized this conduct or has primary, exclusive or any jurisdiction over the wrongful conduct at issue herein nor can provide the complete relief prayed for in this matter. The California Public Utilities Commission ("CPUC") and Federal Communications Commission ("FCC") agencies possess neither exclusive nor primary jurisdiction over the billing or disclosure methods of such charges, or have "de-tariffed" BBG such that there is no basis or reason to refer this matter to either the CPUC or FCC, and the "filed-rate doctrine" does not apply. See Ex. 1.

4.      This action seeks damages and restitution, as well as declaratory and injunctive relief to ensure the illegal practices do not recur and that BBG discloses, prior to the purchase of BBG phone services, all appropriate charges and billing practices in the future.

### THE PARTIES

5.      Plaintiff Nicolas Wood is a citizen of Canada and resides in Vancouver, British Columbia.

6.      Defendant BBG Communications, Inc. is a Delaware corporation that services payphones throughout the United States and internationally.  BBG Communications, Inc. was formed in January 1997.  BBG Communications, Inc. registered and maintains the www.bbgcomm.com and www.bbgusa.com internet domain names.

7.      The president of BBG Communications, Inc. is Gregorio Galicot.

8.      The secretary of BBG Communications, Inc. is Rafael Galicot.

9.      BBG Communications, Inc.'s principal place of business is located at 1658 Gailes Blvd., Suite B, San Diego, CA 92154.  The building at this address is owned by BBG & M LLC, a California Limited Liability Company, which is owned and/or managed by Rafael and Gregorio Galicot.

10.     BBG Communications, Inc. and BBG Global AG (formerly BBG Holdings, Ltd.) share a unity of interest such that they are not distinct entities.

11.     BBG Global AG is a corporation organized under the laws of Switzerland located at Bahnhof Park #4, 6340 Baar, Canton of Zug, Switzerland.  BBG Global AG was formed in June 2006.

12.     Zug is a known tax haven with a corporate tax rate of 15-16%.  BBG Global AG's sole purpose for existence is for tax avoidance.  It is a mere shell and is not separate from the operations of BBG Communications, Inc. that take place in San Diego, California.

13.     Bahnhof Park is a three-level apartment complex with some offices on the lower floor. There is a sign at the front of the building location listing the companies that are located in the complex, and specifically at Bahnhof Park #4.  BBG Global AG is not one of them.

14.     Inside the complex at Bahnhof Park #4 there is a door with a paper sign taped to it that identifies an office as belonging to "BBG Global AG."

15.     Inside the door with the paper sign there are only two offices, two computers, a relatively small file cabinet, and two bookshelves that are mostly empty save for a few notebooks.

16.     The office was observed on a weekday during regular business hours and no employees could be seen inside the office when peering through the office's window.

17.     All contact emails to the BBG Global AG website are directed to info@bbgcomm.com, the email and domain name extension belonging to BBG Communications, Inc.  Similarly, email addresses used by BBG's "agents" use the @bbgcomm.com domain extension, not the extension of BBG Global AG. See Ex. 2.  Indeed, all of Defendants' emails originate from BBG Communications, Inc.'s server in San Diego, CA.

18.     BBG Global AG's privacy policy (available at BBG Global AG's website http://bbgcommch.com/BBG%20Global%20Privacy%20Policy.pdf) admits that the information it collects "is stored in our Sites [sic] located in San Diego, CA and Las Vegas."  See Ex. 3.

19.     Pursuant to the privacy policy, BBG does not differentiate between its entities, thereby admitting that they are one and the same.  BBG further admits that its California-based computers collect information from callers at the point of sale worldwide. See Ex. 3.

20.     BBG Communications Inc.'s privacy policy (available at http://www.bbgusa.com/bbg/privacypolicy1.php) selects San Diego, California as the forum for any complaints by anyone arising anywhere in the world regarding any of the BBG entities' violations of BBG Communications, Inc.'s published privacy policy. See Ex. 4.

21.     Gregorio Galicot is the "president of the board of directors" of BBG Global AG and resides in San Diego, California.  See Ex. 5.

22.     Rafael Galicot is an "authorized signatory" of BBG Global AG and resides in San Diego, California. See Ex. 5.

23.     Gregorio and Rafael Galicot collectively own a 95% share of BBG Global AG through their family trusts which use the same California address as BBG Communications, Inc. See Ex. 6.

24.     Gregorio and Rafael Galicot and/or BBG Communications, Inc. are "general managers" of BBG Global AG within the meaning of Cal. Code Civ. Proc. § 416.10(b) and Cal. Corp. Code § 2110.

25.     BBG Global AG, to the extent it is anything more than a shell company, conducts the core of its operations out of California.

26.     BBG Global AG is a successor of BBG Holdings Limited, which was incorporated under the laws of Bermuda, having its registered office at Clarendon House, 2 Church Street, Hamilton HM DX, Bermuda.  Upon information and belief, Gregorio Galicot and Rafael Galicot owned and/or managed BBG Holdings, Ltd. at all relevant times hereto.

27.     In a July 9, 2003 complaint filed by BBG Communications Inc. and BBG Holdings, Ltd. against a competitor (Case No. 03-cv-0027 (E.D. TX)), BBG identifies itself as follows: "BBG Comm. and BBG Holdings are well-known, multinational, multifunctional communications companies serving the diverse international markets that include North America, Europe, Japan

1  [Hong Kong], Israel, Latin America and the Caribbean basin.  BBG Holdings contracts with

2  various third parties throughout the world (including foreign telephone companies, hotels, airports,

3  and seaports) to provide internal and external communication and telephones.   BBG Comm. acts

4  as the carrier and international long distance reseller to facilitate the contracts between BBG

5  Holdings  and  others.   BBG  Holdings  and  BBG  Comm.  sell  millions  of  dollars  of

6  telecommunications services annually."

7  28.    BBG hires captive agents to negotiate contracts with payphone operators.  BBG

8  negotiates these contracts from its headquarters in San Diego, CA.  Two such agents, Goran and

9  Michel Alexiev, travelled to San Diego in May 2003 to enter into such an agreement, even though

10  the agreement is purportedly between BBG Holdings, Ltd. in Bermuda and the Alexievs' company

11  in the Czech Republic.  The agreements between BBG and its agents contain a choice-of-law

12  provision that selects California law as the governing law, and expressly selects San Diego,

13  California as the forum for any disputes arising under the agreements – anywhere in the world.

14  See. Ex. 7.

15  29.    BBG Communications, Inc.'s San Diego, California location is the headquarters for

16  BBG's worldwide operations and is home to the office of its president, secretary, and other high-

17  level management personnel.  BBG instructs its customer services representatives to expressly

18  identify BBG (or whatever fictitious business names it happens to be using at the time) as a

19  California-based company.   All decisions about and acts related to the unlawful, unfair, and

20  fraudulent business practices complained of herein emanate from BBG's San Diego, California

21  headquarters.

22  30.    The point of dissemination of the omissions and misrepresentations of material

23  facts, policies, call flow designs, and call center scripts for BBG's payphone services around the

24  world is from BBG Communications, Inc.'s headquarters in San Diego, California.

25  31.    The decisions of how BBG conducts and operates it business(es), including, but not

26  limited to, the decisions to charge connection fees and obscene per minute rates and purposefully

27

28

163120

not disclose these material facts on, near or through payphones BBG services are made in BBG

Communications, Inc.'s headquarters in San Diego, California.

32.     BBG Communications Inc. charged Plaintiff's and putative class members' credit

cards in U.S. dollars, not local foreign currencies.

33.     BBG Communications Inc. negotiates reductions in the price of its services with

complaining callers from its headquarters in San Diego, California.

34.     BBG Communications, Inc. is the holder of U.S. registered trademarks some of

which have been in use since June 30, 1996. These trademarks include "UK Connect," "Canada

Connect," "USA Connect," and "Swipe & Call."

35.     DOES 1-10 are individuals, associations or corporations that are affiliated or related

to BBG and who will be identified and named as discovery progresses and their roles in the

wrongdoing   described herein is revealed. Plaintiff is presently unaware of the true names,

capacities or liabilities of the other defendants sued herein under the fictitious names DOES 1

through 10, inclusive, whether individual, corporate, an association or otherwise, and Plaintiff will

seek leave of Court to amend this complaint to allege the true names, capacities and liabilities of

said DOES after the same have been ascertained.  Plaintiff, however, is informed and believes, and

based thereon alleges, that at all relevant times mentioned herein, each of the defendants sued

herein as a DOE, whether individual, corporate, an association or otherwise, is in some way liable

or responsible to Plaintiff based on the facts herein alleged, and caused injuries and damages

proximately thereby.

36.     Plaintiff is informed and believes and thereon alleges that BBG Communications,

Inc., BBG Global AG, BBG Holdings, Ltd. and DOES 1-10 are each alter egos of one another, are

each agents or principals in agency/principal relationships with one another, and are each

successor/predecessor corporations of each other, and are liable for the acts and omissions of each

other as alleged herein.

37.     Plaintiff is informed and believes and based thereon alleges that BBG

Communications, Inc., BBG Global AG, BBG Holdings, Ltd. and DOES 1-10 are alter egos of one

**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

another, or otherwise abuse the corporate privilege, in that they dominate the affairs of one another; a unity of interest existed and exists between one another; each one is a mere shell for the manipulation by the others; each was inadequately capitalized, insolvent, and/or failed to abide by the formalities of corporate existence; and that each is the successor/predecessor in interest to one another.  Adherence to the fiction of a separate legal existence of BBG Communications, Inc., BBG Global AG, BBG Holdings, Ltd. and DOES 1-10 would result in injustice. Plaintiff is informed and believes and based thereon alleges that BBG Communications, Inc., BBG Global AG, BBG Holdings, Ltd. and DOES 1-10 are so formed and organized by their shareholders with the fraudulent intent of evading civil or criminal liability.  Each of BBG Communications, Inc., BBG Global AG, BBG Holdings, Ltd. and DOES 1-10 should be held responsible for the acts of the others as they pertain to this action.  Inequity will result if the acts of each defendant are treated as the acts of each defendant alone.

38.     BBG Communications, Inc. registered the fictitious business name "International Satellite Communications" with the San Diego County Recorder's office on July 7, 2006.

39.     BBG Communications, Inc. registered the fictitious business name "B Tel Communications" with the San Diego County Recorder's office on August 17, 2005.

40.     BBG Communications, Inc. registered the fictitious business name "Call To International" with the San Diego County Recorder's office on January 31, 2003 and April 1, 2009.

41.     BBG Communications, Inc. registered the fictitious business name "CallDominican" with the San Diego County Recorder's office on April 1, 2009.

42.     BBG Communications, Inc. registered the fictitious business name "CallPayPhone" with the San Diego County Recorder's office on June 19, 2009.

43.     BBG Communications, Inc. registered the fictitious business name "ChicagoPhone" with the San Diego County Recorder's office on June 3, 2010.

44.     BBG Communications, Inc. registered the fictitious business name "Credit Phone" with the San Diego County Recorder's office on June 3, 2010.

**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

45.     BBG Communications, Inc. registered the fictitious business name "D Repub Call" with the San Diego County Recorder's office on April 4, 2009.

46.     BBG Communications, Inc. registered the fictitious business name "DenverPayFon" with the San Diego County Recorder's office on December 15, 2008.

47.     BBG Communications, Inc. registered the fictitious business name "Detroit Call" with the San Diego County Recorder's office on May 4, 2009.

48.     BBG Communications, Inc. registered the fictitious business name "Domncan Call" with the San Diego County Recorder's office on April 1, 2009.

49.     BBG Communications, Inc. registered the fictitious business name "DomReplcCall" with the San Diego County Recorder's office on June 19, 2009.

50.     BBG Communications, Inc. registered the fictitious business name "Europe Phone" with the San Diego County Recorder's office on June 19, 2009.

51.     BBG Communications, Inc. registered the fictitious business name "FairCall" with the San Diego County Recorder's office on October 4, 2010.

52.     BBG Communications, Inc. registered the fictitious business name "French Phone" with the San Diego County Recorder's office on June 19, 2009.

53.     BBG Communications, Inc. registered the fictitious business name "German Phone" with the San Diego County Recorder's office on June 19, 2009.

54.     BBG Communications, Inc. registered the fictitious business name "Germany Call" with the San Diego County Recorder's office on June 19, 2009.

55.     BBG Communications, Inc. registered the fictitious business name "Gwifi Powered by Gtel" with the San Diego County Recorder's office on February 19, 2009.

56.     BBG Communications, Inc. registered the fictitious business name "Hawaii Call" with the San Diego County Recorder's office on May 4, 2009.

57.     BBG Communications, Inc. registered the fictitious business name "Holland Call" with the San Diego County Recorder's office on June 19, 2009.

8
**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

1    58.    BBG Communications, Inc. registered the fictitious business name "Houston Call"
2    with the San Diego County Recorder's office on May 4, 2009.

3    59.    BBG Communications, Inc. registered the fictitious business name "International
4    Caller" with the San Diego County Recorder's office on June 3, 2010.

5    60.    BBG Communications, Inc. registered the fictitious business name "International
6    Calling Services" with the San Diego County Recorder's office on June 3, 2010.

7    61.    BBG Communications, Inc. registered the fictitious business name "Kellee Phone"
8    with the San Diego County Recorder's office on June 3, 2010 and October 4, 2010.

9    62.    BBG    Communications,    Inc.    registered    the    fictitious    business    name
10   "KOKUSAITSUWA" with the San Diego County Recorder's office on December 15, 2008.

11   63.    BBG Communications, Inc. registered the fictitious business name "LA Payphone"
12   with the San Diego County Recorder's office on May 4, 2009.

13   64.    BBG Communications, Inc. registered the fictitious business name "LAX
14   Payphones" with the San Diego County Recorder's office on May 4, 2009.

15   65.    BBG Communications, Inc. registered the fictitious business name "Longdist Dom"
16   with the San Diego County Recorder's office on April 1, 2009.

17   66.    BBG Communications, Inc. registered the fictitious business name "Mexico Phone"
18   with the San Diego County Recorder's office on June 19, 2009.

19   67.    BBG Communications, Inc. registered the fictitious business name "Longdist Dom"
20   with the San Diego County Recorder's office on April 1, 2009.

21   68.    BBG Communications, Inc. registered the fictitious business name "Minnesotacall"
22   with the San Diego County Recorder's office on May 4, 2009.

23   69.    BBG Communications, Inc. registered the fictitious business name "My Travel Pin"
24   with the San Diego County Recorder's office on February 19, 2009.

25   70.    BBG Communications, Inc. registered the fictitious business name "MyTravelPin
26   Com" with the San Diego County Recorder's office on February 19, 2009.

27

28

9
**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

71.     BBG Communications, Inc. registered the fictitious business name "National Telephone Collection Services" with the San Diego County Recorder's office on April 14, 2003 and April 1, 2009.

72.     BBG Communications, Inc. registered the fictitious business name "Payphone Call" with the San Diego County Recorder's office on April 1, 2009.

73.     BBG Communications, Inc. registered the fictitious business name "PayphoneCall" with the San Diego County Recorder's office on December 15, 2008.

74.     BBG Communications, Inc. registered the fictitious business name "Phone Denver" with the San Diego County Recorder's office on May 4, 2009.

75.     BBG Communications, Inc. registered the fictitious business name "Phone Kellee" with the San Diego County Recorder's office on June 3, 2010 and October 4, 2010.

76.     BBG Communications, Inc. registered the fictitious business name "Phonecalldom" with the San Diego County Recorder's office on April 1, 2009.

77.     BBG Communications, Inc. registered the fictitious business name "Rdom Telecom" with the San Diego County Recorder's office on April 1, 2009.

78.     BBG Communications, Inc. registered the fictitious business name "Sandiegocall" with the San Diego County Recorder's office on May 4, 2009.

79.     BBG Communications, Inc. registered the fictitious business name "Sanfco Phone" with the San Diego County Recorder's office on April 1, 2009.

80.     BBG Communications, Inc. registered the fictitious business name "Telecom Call" with the San Diego County Recorder's office on June 19, 2009.

81.     BBG Communications, Inc. registered the fictitious business name "USA Payphone" with the San Diego County Recorder's office on April 1, 2009.

82.     BBG Communications, Inc. registered the fictitious business name "Yak Communications" with the San Diego County Recorder's office on December 15, 2008.

83.     BBG charges consumers' credit and debit cards for phone calls made through its service under these various fictitious business names in an effort to frustrate consumers' efforts to

**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

1    identify the actual entity that charged their credit or debit cards; which is BBG Communications,

2    Inc. To the extent BBG also includes a 1-800 number beside the fictitious business name on the

3    credit or debit card statement, customer service representatives who answer the 1-800 number

4    identify themselves as working for International Satellite Communications or another fictitious

5    business name. This is done for the purpose of preventing consumers from identifying the actual

6    entity that overcharges them for phone calls and to prevent consumers from taking action against

7    BBG Communications, Inc. for the purpose of obtaining restitution of their wrongfully taken

8    money.

9                              **JURISDICTION AND VENUE**

10          84.    This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2) because the

11   amount in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class

12   action in which the members of the proposed Class (as hereinafter defined) and Defendants are

13   citizens of different states, and the proposed Class consists of over 100 members.

14          85.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because

15   Defendants do substantial business in this district, maintain their headquarters in this district, and a

16   substantial part of the events or omissions giving rise to Mr. Wood's claims took place within this

17   district.

18          86.    BBG has availed itself of laws and protections of this jurisdiction, and has

19   significant contacts within California, such that the application of California law to BBG's

20   misconduct would not be unconstitutional. No other jurisdiction has a greater interest than

21   California in having its law applied to the practices complained of herein, and California's interest

22   in having its laws applied would be more impaired than that of any other jurisdiction if California

23   law were not applied to the acts of Defendants. By making California the place where its

24   management and leaders operate and make decisions and the base of the companies' operations,

25   BBG purposefully availed itself of the laws of California.

26          87.    BBG charges consumers' credit cards in United States dollars, not local foreign

27   currencies.

28
                                        11
                       **FIRST AMENDED CLASS ACTION COMPLAINT**

163120

88.     Gregorio Galicot, the president/chairman of the board of directors/owner/principal/ controller of Defendants, owns property and resides in this jurisdiction.

89.     Rafael Galicot, the vice president/secretary/signatory/principal of Defendants owns property and resides in this jurisdiction.

90.     Pursuant to BBG Global AG's Privacy Policy, the computer server that initiates, processes, and completes the transactions using Plaintiff's and Class member's debit and credit cards is located in San Diego, California.

91.     BBG has expressly negotiated for and selected the application of California law to any disputes arising out of contracts it enters into with agents and other third parties.

92.     BBG has expressly selected San Diego, California as the forum for disputes arising anywhere in the world under its privacy policy or under agreements with its agents and other third parties.

93.     Defendants' officers, directors, managers, majority and controlling shareholders and/or employees developed Defendants' unlawful scheme in California. Defendants provide payphone services like the ones complained of herein in this district.  Defendants engaged in transactions in this district, caused omissions to be disseminated from this district, entered into agreements in this district, and settle customer billing disputes in this district. Thus, a substantial part of Defendants' liability arose from acts performed and omissions selected in this district.

94.     BBG Global AG negotiates agent or traffic agreements in San Diego, CA.

95.     BBG generally targets travelers and non-residents of the telephones' home states or countries.  Therefore, BBG's conduct is highly likely to escape review unless this litigation proceeds before this Court, home to BBG's headquarters.

## FACTUAL BACKGROUND

96.     BBG claims that it presently provides services for over 350,000 payphones and processes 300 million minutes of calls per month.

97.     BBG contracts with and forms joint ventures with telephone system operators and the parties share revenues generated by the telephones.

98.     BBG does not usually disclose anything about the fact it services a particular telephone.  On some telephones, however, BBG advertises its name (or that of one of its many fictitious business names) and posts pictures of all major credit card logos, but does not disclose and/or misrepresents the additional fees or rates associated with using a credit card, nor does BBG disclose any of the fees or rates it charges for making phone calls by live or automated operator once a caller initiates a long distance phone call.

99.     BBG's software blocks calls that are made using calling cards or toll-free access telephone numbers issued by companies such as Sprint and AT&T that charge significantly lower phone usage rates than BBG.  This conduct deprives consumers of reasonable and less expensive alternative means for making phone calls.

100.    Upon discovering they have been charged for a phone call under one of BBG's fictitious business names, consumers sometimes locate and call BBG, or "International Satellite Communications" as BBG commonly identifies itself, to dispute the charges.  BBG instructs its operators/customer service representatives to frustrate consumers' attempts to obtain information about rates, refunds, the physical address of the company, and the availability of customer service managers, by refusing to provide rate information, refunds of the excessive and undisclosed connection fees, information about the rates it charges, the physical address of the places where its operations are performed or allowing callers to speak with customer service managers.

101.    BBG operates using a secret rebate/refund program which reimburses only consumers who make vociferous complaints of extraordinary duration or frequency regarding the fact that BBG's charges are undisclosed and excessive, and then only to a limited extent.  BBG fails to reimburse all consumers for all charges wrongfully imposed and fails to disclose the potential to have some or all of its charges refunded.

102.    On August 13, 2010, at the Hong Kong International Airport, Mr. Wood used a payphone (Payphone No. CP0146) to make several international telephone calls to Canada using his credit card. See Figure 1 below.

///

**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

**Figure 1.**



103.     Attached to the telephone is a sign. See Fig 2 below. Under the section titled "Tariff," it states that the rate for local calls is HK$1 for 5 minutes (equivalent to approx. US$0.13). For international calls, it provides a number to call for the rate. Upon calling the number, an automated Hong Kong Broadband Network ("HKBN") operator answers and does not identify "International Satellite Communications" nor any other BBG entity as being involved with the delivery of telecommunications services from the telephone, and there is no disclosure of a connection fee.  Mr. Wood had no way of suspecting that any entity other than HKBN serviced the payphone.  Furthermore, the automated operator states that the rate for calls from Hong Kong to Canada or the United States is "Eight Hong Kong Dollars" or the equivalent of approximately

US$1.04.  There is no description of whether the rate is per minute, per 5 minutes, or per call. Even if it were per minute, Mr. Wood paid many times more than the stated rate, plus a connection fee, for each of the calls he placed through the use of Defendants' services.

**Figure 2.**



**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

104.     Further, as shown in Figure 3, below, the digital screen on the payphone itself indicates the cost of local calls to be HK$1 (consistent with the accompanying sign) and IDD (International Direct Dial) calls to be HK$5 (equivalent to approximately US$0.65).

**Figure 3.**



105.     Mr. Wood used the payphone depicted in Figures 1-3 to make five (5) calls to Canada using his credit card.  Per the instruction for making credit card calls in Figure 2, above, Mr. Wood picked up the handset, swiped his credit card, and dialed the numbers.  Two of the calls went straight to voicemail messaging systems, and the other three totaled 51 minutes in length. Based on the rate advertised on the screen, Mr. Wood expected to be charged approximately HK$53 (US$6.84) assuming the rate advertised was $5 for 5 minutes.  Even if the rate were per minute, Mr. Wood expected the maximum charge for his calls to be HK$251 (US$33.15).

106.     At no point did BBG prompt Mr. Wood to press "0" to obtain rate information, nor did BBG disclose to him in any way that any rate information different from that posted by or available from HKBN was available.

**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

107.     Upon subsequently reviewing his credit card statement online (See Ex. 8), Mr. Wood was shocked to find that he had been charged a total of US$261.40 (approx. HK$2,026.15). Mr. Wood's credit card statement identified the business entity responsible for the charges as "CALL FROM CHINA AUG 12 800 608 0575."  He took the photos in Figures 1-3 on his return trip through Hong Kong International Airport.

108.     On or about August 26, 2010, Mr. Wood called 800-608-0575 and a person on the other end of the line identified himself as working for International Satellite Communications ("ISC") and identified ISC and the call center as being located in California.

109.     Mr. Wood inquired of the ISC representative why he was charged so much for his calls.  The ISC representative explained the charges as follows:

a.  Call 1 - US$10.00 connection fee, plus US$3.98 per minute for 13 minutes (total US$61.85);

b.  Call 2 - US$10.00 connection fee, plus US$3.98 per minute for 24 minutes (total US$105.74);

c.  Call 3 - US$10.00 connection fee, plus US$3.98 per minute for 14 minutes (total US$65.84);

d.  Call 4 - US$10.00 connection fee, plus US$3.98 per minute for 1 minute (call went straight to voicemail messaging service) (total US$14.00); and

e.  Call 5 - US$10.00 connection fee, plus US$3.98 per minute for 1 minute (call went straight to voicemail messaging service) (total US$13.97).

110.     Mr. Wood requested a refund of the difference between the price he was charged and what his call would have cost based on the rates advertised on the telephone he used, assuming the rates were offered on a per minute basis, but the ISC representative refused Mr. Wood's demand.

111.     Mr. Wood explained to the ISC representative that neither the connection fee nor the rates were disclosed to him prior to him initiating the calls.  Mr. Wood asked the ISC representative what he could have done, before making the subject calls, to learn the phone usage

1  rates BBG was going to charge him for his calls.  The ISC representative was unable to explain

2  how he could have obtained the actual rate information.

3      112.    Mr. Wood relied on the omissions of the connection fee and extraordinarily high

4  per minute rates to his detriment in that he would not have made the calls he made had he known

5  he would have incurred a US$10.00 connection fee per call and would subsequently be charged

6  almost US$4 per minute for making telephone calls from Hong Kong to Canada.

7  **Material Omissions**

8      113.    BBG fails to disclose material information at the point of purchase to consumers

9  who it induces into purchasing BBG's services to their detriment.  Plaintiff now pleads the

10  fraudulent omissions with the requisite particularity and specificity and incorporates all other

11  paragraphs herein by reference.

12      114.    **WHO**:        BBG Communications, Inc., and BBG Global AG, are the entities

13  that cause the omissions to be disseminated to the point of purchase at which they fail to disclose

14  the Material Facts (defined infra) on the payphones they service.  As alleged herein, BBG Global

15  AG is an agent, successor and/or alter ego of BBG Communications, Inc.

16      115.    **WHAT**:

17          1)      BBG fails to disclose the connection fee it charges for each telephone call

18  made through its telephone service;

19          2)      BBG fails to disclose and/or misrepresents the per minute rates it charges

20  for telephone calls;

21          3)      BBG fails to disclose that telephone calls made through its phone service

22  that go unconnected, or are connected to voicemail messaging systems, will incur both a

23  connection fee and a minimum per-minute charge (i.e. 5 min. minimum at $5 per minute) on

24  telephone calls that last less than 5 minutes or that are initiated by the caller but go unconnected

25  (e.g. the caller receives a busy or error dial tone and no connection to another telephone is

26  established; and

27

28

163120

4)     BBG fails to disclose that consumers can receive as much as a 30% rebate/refund if they press a BBG customer service representative hard or long enough under BBG's secret rebate/refund policy (items 1-4 of this paragraph are collectively hereinafter referred to as "Material Facts").  These facts are material because a reasonable consumer would consider them important in deciding whether to place a telephone call using Defendants' services.

116.   **WHEN**:     BBG fails to disclose the Material Facts prior to and at the point of purchase by printed words located on or adjacent to the telephones, or before or at the time of purchase through oral communications provided by pre-recorded messages or live operators after the consumer has picked-up the phone receiver but has not yet initiated their actual payment for the forthcoming telephone call.  In the case of Mr. Wood, BBG failed to disclose the Material Facts on August 13, 2010 when he used a public telephone to place five long distance telephone calls initiated from Hong Kong to telephones located in Canada.

117.   **WHERE:**     BBG disseminated its misrepresentations and omissions of Material Facts and refund policies from its headquarters in California.  All decisions regarding BBG's marketing and advertising and refund and billing policies emanate from BBG's California headquarters as all applicable decision makers, reside, carry-out their jobs, make decisions and operate out of BBG's California headquarters.  Further, BBG's dissemination of omissions and misrepresentations of Material Facts are communicated by words adhered on or immediately adjacent to the telephones or by pre-recorded messages or live operators through the telephones it services throughout the world in airports, hotels, seaports, and train stations.  In the case of Mr. Wood, BBG failed to disclose the Material Facts that it disseminated from California on or through a public telephone to which BBG provided telephone service and that was located in the Hong Kong International Airport.

118.   **HOW and WHY**:  BBG's failure to disclose the Material Facts is misleading and has a tendency to mislead a reasonable consumer because a consumer of long-distance telecommunications services would want to know whether he or she is going to be charged significant connection fees and/or shockingly high per-minute rates prior to placing a call by way

of BBG's telephone services. In the case of Mr. Wood, based on the only representations available to him before he placed his calls, he believed that he would have been charged a maximum amount of HK$53 (approximately US$6.84) for the 5 calls he placed. Instead, he was misled into paying US$261.40, or over 38 times what he expected to pay based on the representations made on the telephone depicted in Figures 1-3, above. To place his calls, Mr. Wood had to swipe his credit card and have his credit card payment approved; after which he had no control over what BBG would charge him as BBG had the unfettered discretion to charge his card any amount it elected. Unless the Material Facts are communicated to consumers before they provide the means of payment to BBG, they have no ability to decide whether to pay the connection fees or usage rates BBG charges.

119. BBG has exclusive knowledge of its connection fees, rates, charges, billing policies, and refund policies. BBG actively conceals its connection fees, rates, charges, billing policies, and refund policies. BBG also makes partial false representations by stating in printed words adhered to some telephones that it services that users will be charged low usage rates, but withholds, suppresses and conceals other material information such as significant connection fees, minimum charge billing policies, actual rates, charges, and rebate/refund policies.

120. BBG has not refunded Nicolas Wood any part of the US$261.40 that he paid to BBG, and BBG's failure to disclose the Material Facts continues to this date.

121. BBG actually and proximately caused Mr. Wood's injury in that Mr. Wood would not have placed the calls using BBG's services had BBG disclosed the Material Facts.

**Defendants' Knowledge/Reckless Disregard of the Falsity of Their Omissions**

122. The Better Business Bureau ("BBB") has rated BBG Communication, Inc. "F" on a scale of A-F, "A" being the best and "F" being the worst, based the number of consumer complaints the BBB has received regarding BBG's business practices.

123. Indeed, consumer websites disclose hundreds of complaints about BBG's phone rates, charges and failure to truthfully and completely disclose them in advance of the time when a caller places his or her telephone call. The following is a sampling of such complaints:

| | |
|---|---|
| www.complaintsboard.com<br><br>Posted: 2008-10-16<br><br>Retrieved: 1/27/2011 | "I'm U.S. Navy and recently made a pay phone call while in port in the western pacific islands. The pay phone would only accept a credit card and gave no rates or company name at all. I took a $30 charge for a 15 min call and wrote it off as 'should have known better'. However, a month later i find $76 charged to my card from this BBG Communications for no apparent reason at all. I'm still in the process of trying to get my money back and will most likely have to cancel my card just to keep them from continuing to charge me without using their services at all. Watch out for these guys. They're a bunch of crooks." |
| www.complaintsboard.com<br><br>Posted: 2008-05-14<br><br>Retrieved: 1/27/2011 | "On April 30, 2008, I made a phone call from Schipol Airport to Amsterdam. I was charged $15.46 for the phone call. I called the company, BBG Communications, San Diego, CA 92101 to file a complaint about the call. They told me that I needed to have checked the rates first. I told them I don't know how that was possible, as there wasn't any information at, in or around the phone booth indicating that the phone call was going to be made through BBG and/or their rates. I also called my credit card co. to file a dispute, which is in process.<br><br>They told me, however, that by putting my card into the phone, I authorized BBG to handle the phone call. I said I had no idea, or information, that when I put my credit card into the phone for a normally $.25 phone call, 10 minutes away, that it was going to be made by a company in San Diego, Ca., 6000 miles away, for $15. I wasn't informed or given any choices to continue or discontinue the transaction." |
| www.complaintsboard.com<br><br>Posted: 2008-05-14 | "Robbed by BBG as well. On my way to the combat zone in Iraq from Ft. Hood, TX with a brief layover in Liepzig, Germany. While in Liepzig, the only phones available were the ones in the "secure |

| | |
|---|---|
| Retrieved: 1/27/2011 | zone" of the terminal meant for US Soldiers traveling to/from either Iraq or Afghanistan. No carrier name was on these phones, nor was there any sort of "price per minute" on or near the phones either. Attempts to use an AT&T Calling Card on these phones proved fruitless, because the only thing they would take was a credit card.<br><br>Made a quick 4 minute call from Liepzig to Copperas Cove, TX and received a bill from BBG for $38 instantly. Four days later, that bill turned into another $80 from straight out of the blue. Wife contacted the Better Business Bureau, and now we're waiting on word from them to see what can be done to put BBG out of business...completely." |
| www.complaintsboard.com<br><br>Posted: 2008-05-14<br><br>Retrieved: 1/27/2011 | "I tried using a pay phone at the Denver Airport to make a call to Omaha Nebraska when the call would not connect using quarters I used my card thinking it would be the same amount as what was asked from cash. I was never informed of the charges nor did I say I accepted them. That one minute call cost me $20 dollars. When I called the company to tell them I was not informed how much the call would cost I was told it was my fault because I did not ask. This is a complete scam. They deliberately keep this information from the consumer because they know no one would finish the call. I will be disputing these charges when they go through." |
| www.complaintsboard.com<br><br>Posted: 2009-01-15<br><br>Retrieved: 1/27/2011 | "I recently traveled to Canada from Texas and my story is exactly the same as everybody else's here. I very briefly used the payphone at the airport in Toronto to call home and tell my parents that my flight was delayed. Most people said that there wasn't any price on the phone but honestly I don't remember. I made a call |

| | |
|---|---|
| | for a max of 2-3 mins, just long enough to relay the info about my flight and when I got home I already had a pending charge for 49.95. This is absurd." |
| www.complaintsboard.com<br><br>Posted: 2010-12-20<br><br>Retrieved: 1/27/2011 | "I recently travelled to Singapore for work and while staying at Changi Village tried to make a phone call to tell my girlfriend in Australia the time I would be home. I tried 5 attempts to call with no success (always a unavailable dial tone) and finally gave up. I checked my bank statement 2 days later and they have charged me $216 AUD. I have been in contact with my bank and i will be disputing the claim I will keep posted about the outcome." |
| http://800notes.com/Phone.aspx/1-800-608-0575/2<br><br>Posted: 2009-09-3<br><br>Retrieved: 1/28/2011 | "Here another bad experience with International Satellite Communication, LA, USA<br><br>I tried several times to make a call to Canada from the same kind of phone booth at the Heathrow London airport, but it didn't end up : the person I was calling (home phone, no cell) has an answering machine, but it just rang and rang for very long, strangely without getting to the answering machine, and than i hang up. Nobody answered and the answering machine never started.<br>Now I just saw my visa bill and saw that International Satellite Communication -<br><br>CALL FROM UKPHONE AUG 800-608-0575 LU<br><br>- charged me two amounts: $22.33  and $34.67. And that for not reaching anybody, not even the answering machine of the person. Amazing!<br><br>So I know just called them, and they told me they could refund $20, what I refused. I told them I want to be refund for the hole |

| | |
|---|---|
| | amount since they didn't provided me any service. Then they told me they could make an investigation. I told them to do so. Know i have to call them back in 30-50 days (!!) to know the result and really hope that they will refund me the hole, or at least the $20 they offered me today!!<br><br>Plus: they don't have service in french, just in english or spanish. Unacceptable for a company present in the whole world!" |
| http://800notes.com/Phone.aspx/1-800-608-0575/2<br><br>Posted: 2009-08-13<br><br>Retrieved: 1/28/2011 | "This is an international phone calling company, "International Satellite Communications". I was charged $41 each for two 30-second phone calls from a Dublin, Ireland pay phone to the US. I called this number later and they told me there is a connecting fee of $14.99 plus $5 per minute. That doesn't sound like $40, right? Well, apparently they also have a minimum time of 5 minutes. This is not stated on the pay phone anywhere. Their policy you have to somehow know that you need to speak to live operator to get this information. Basically, you have to have gotten ripped off before to know that you need to check.<br><br>When I complained about it, though, they gave me a total of $37 back. I'm not going to get anywhere near this company ever again but know that you can get some of your money back if they got you. It only took a few minutes of bitching." |
| http://800notes.com/Phone.aspx/1-800-608-0575/2<br><br>Posted: 2008-08-8<br><br>Retrieved: 1/28/2011 | "I saw a charge on my credit card stating "CALL FROM CHINA 800 608 0575" and i was charged for about 46 dollars. I do not know how I end up using this number and I was never provided with the vendor name and price list. I made 2 phone calls from HK to Mainland China. The first one did |

24
**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

| | not go through and the second was only less than 2 minutes.<br><br>I made a similar phone call from my hotel in HK to the same city and it only cost me 8 dollars.<br><br>I am really mad at this service and want to warn anybody who is going to use payphone with credit card!" |
|---|---|

124.   BBG relies on the fact that many reasonable consumers (and especially entities) have become used to merchants who are fair and scrupulous and thus do not scrutinize every credit or debit card charge that appears on their credit card bills and bank statements.   BBG takes advantage of the reasonable assumption citizens of industrialized countries have developed through experience that modern technology and competition has made international telecommunications services less expensive, and in some cases free – such as some Voice Over Internet Protocol ("VOIP") services or a video call through a free internet chat service using a computer.

125.   BBG's business plan relies on being able to charge undisclosed and outrageous fees and rates that consumers will never notice without close scrutiny of the individual charges on their credit card statements.   If someone other than the phone user receives, reads and pays the credit card bill to which the BBG phone service user charged their phone call, the payor will not know that BBG charged the user much more than it represented it would charge for its phone services.

126.   Even so, BBG receives numerous complaints about its business practices from consumers.   Indeed, until recently, BBG hosted a website under one of its fictitious business names "International Satellite Communications" at www.internationasatellitecom.com which did no more than anticipate a high number of complaints by providing the basic instructions on how to submit a claim to have reduced the disputed phone usage or connection charges (assuming one did the research necessary to discover that ISC was responsible for their particular phone usage and connection charges, and subsequently found the website). Furthermore, the ISC website did not

25

**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

conspicuously disclose rate information in violation of federal regulations and made no disclosure of a partial or full refund policy.  See Figure 4 below for a computer screenshot of the former ISC website in its <u>entirety</u>.

**Figure 4.**



**TOLLING**

127.    Any applicable statutes of limitation have either not fully accrued or are equitably tolled by Defendants' affirmative acts of fraudulent concealment, suppression, and denial of the true facts regarding the existence of the practices at issue herein. Such acts of fraudulent concealment include concealing, withholding, not divulging, covering-up and refusing to candidly, fully and conspicuously disclose to Class members the Material Facts set forth in detail above. Through such acts of fraudulent concealment, Defendants were able to actively conceal from the

1    Class the truth about Defendants' practices, thereby tolling the running of any applicable statutes

2    of limitation.

3                              **CLASS ACTION ALLEGATIONS**

4         128.     Nicolas Wood brings this action on behalf of himself, and all others similarly

5    situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The Class

6    that Plaintiff Wood seeks to represent is defined as follows:  All persons or entities in the United

7    States and Canada whose credit or debit cards were charged by BBG for payphone services in any

8    country in which BBG offers card swipe services from January 2007 through the date of class

9    notice ("Class").   Plaintiff also seeks certification of a subclass under the Consumer Legal

10   Remedies Act (Cal. Civ. Code § 1750 et seq.) ("CLRA") of all consumers, as defined by Cal. Civ.

11   Code § 1761(d), in the United States and Canada whose debit or credit cards were charged by

12   BBG for pay telephone services in any country in which BBG offers card swipe services from

13   January 2008 through the date of class notice ("Subclass").

14        129. Excluded from the Class and Subclass are (i) Defendants, any entity in which

15   Defendants have a controlling interest or which has a controlling interest in Defendants, and

16   Defendants' legal representatives, predecessors, successors and assigns; (ii) governmental entities;

17   (iii) Defendants' employees, officers, directors, agents, and representatives and their family

18   members; and (iv) the Judge and staff to whom this case is assigned, and any member of the

19   Judge's immediate family.  Plaintiffs reserve the right to amend the Class definitions if discovery

20   and further investigation reveals the Class and Subclass (collectively hereinafter referred to as

21   Class) should be expanded or otherwise modified.

22        130.     This action has been brought and may properly be maintained as a class action,

23   pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure because there is a

24   well-defined community of interest in the litigation and the proposed class is easily ascertainable.

25        131.     <u>Numerosity</u>.  The proposed class is so numerous that joinder of all of its members

26   in one action is impracticable. As previously alleged, BBG admits in Federal District Court filings

27   that "BBG Comm. and BBG Holdings are well-known, multinational, multifunctional

28                                          27
                            **FIRST AMENDED CLASS ACTION COMPLAINT**

communications companies serving the diverse international markets that include North America, Europe, Japan, [Hong Kong], Israel, Latin America and the Caribbean basin.  BBG Holdings contracts with various third parties throughout the world (including foreign telephone companies, hotels, airports, and seaports) to provide internal and external communication and telephones." BBG further admits that "BBG Holdings and BBG Comm. sell millions of dollars of telecommunications services annually." The exact number and identities of Class members are unknown at this time and can only be ascertained through appropriate investigation and discovery.

132.    <u>Common Issues Exist and Predominate</u>.  Common questions of law and fact exist as to all members of the Class and predominate over any questions which affect only individual members of the Class.  There is a well-defined community of interest in the questions of law and fact involved that affect Plaintiff and Class members who purchased BBG's services as BBG's omissions of Material Facts are nearly identical worldwide. The questions of law and fact predominate over questions that affect only individual class members and include, without limitation:

  a.  Whether Defendants failed to disclose the Material Facts;

  b.  Whether Defendants' uniform course of conduct constitutes an unfair act or business practice;

  c.  Whether Defendants' uniform course of conduct constitutes an unlawful act or business practice;

  d.  Whether Defendants' uniform course of conduct constitutes a fraudulent act or business practice;

  e.  Whether Defendants' failure to disclose Material Facts is likely to deceive a reasonable consumer;

  f.  Whether Defendants violated provisions of the CLRA;

  g.  Whether Defendants knew, recklessly disregarded or reasonably should have known about the omissions of Material Facts;

163120

h.   Whether Defendants are being unjustly enriched by continuing to retain money that they wrongfully obtained from Class members;

i.   Whether Defendants wrongfully or improperly charged Class members for telephone services;

j.   The amount of income Defendants received and/or the amount of money Class members lost as a result of Defendants' misconduct;

k.   Whether as a result of Defendants' misconduct Class members have suffered damages, and if so, the appropriate amount thereof; and

l.   Whether, as a result of Defendants' misconduct, Plaintiffs are entitled to equitable relief and/or other relief, and if so, the nature of such relief.

133.   <u>Typicality</u>.   Plaintiff's claims are typical of the claims of the Class members. Plaintiff used a credit card to make calls using a payphone to which BBG provided telephone services.  Unbeknownst to him, due to the complete lack of disclosure, he was charged uncommon, unconscionable, oppressive, and extraordinarily high connection fees and per-minute telephone usage rates.  Class members have experienced similar situations based on nearly identical facts. The right of each Class member to payment of any actual, incidental, consequential, exemplary, and/or statutory damages or equitable monetary relief resulting therefrom arises equally and is attributable to Defendants' misconduct, as these claims arise from the same nucleus of operative facts.  Therefore, the claims of the Plaintiff are, and will be, typical of Class members.

134.   <u>The Class is Ascertainable</u>.  Plaintiff has adequately defined the Class, as detailed above, so the Court will be able to use the definition to determine class membership.

135.   <u>Adequacy</u>.  Plaintiff can and will fairly and adequately represent the interests of all Class members, since Plaintiff has no conflicts with or interests antagonistic to other Class members.  Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class action litigation.

136.   <u>Superiority</u>.  The proposed class action is superior to other available means to achieve a fair and efficient adjudication of this controversy.  Class action treatment will permit a

large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  The disposition of their claims in this case and as part of a single class action lawsuit, rather than thousands of individual lawsuits, will benefit the parties and greatly reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds of separate lawsuits.  Furthermore, given the extraordinary expenses and burden in conducting the discovery and presentation of evidence about the Defendants' misconduct, the burden of individual litigation would make it extremely difficult, if not impossible for individual members of the Class to redress the wrongs asserted herein, while an important public interest will be served by addressing the matter as a class action.  The telephone charges, while unconscionably high by comparison to market rates, usually do not amount to more than a few hundred dollars of loss for each Class member.  It would be impractical for a Class member to sue for only his or her individual claim arising from Defendants' misconduct as the court costs and attorney fees would be disproportionate for any one Class member to pursue the claims asserted herein. Moreover, separate prosecution by thousands of individual members of the Class would likely establish inconsistent standards of conduct for the Defendants and result in the impairment of and potential harm to Class members' rights and the disposition of their interests through actions to which they were not parties.

137.    Plaintiff is informed and believes that a great amount of time and expense will be saved by conducting the discovery and presentation of evidence about the omissions of Material Facts and Defendants business practices, acts and omission related thereto, in contrast to repeatedly conducting the same discovery and presenting the same evidence in hundreds or thousands of separate lawsuits brought on the common questions presented by the allegations of this complaint.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

**FIRST CAUSE OF ACTION**

**(Violations of Cal. Bus. & Prof. Code § 17200 *et seq.*)**

138. Plaintiff repeats and re-alleges all prior paragraphs and incorporates them as if fully set forth herein.

139. Defendants have engaged in unfair, unlawful, and fraudulent business acts or practices as set forth herein.

140. Plaintiff brings this cause of action on behalf of himself and the Class, pursuant to California Business and Professions Code, §17200, *et seq.*

141. Defendants' conduct constitutes **unfair** business acts and/or practices because Defendants' practices have caused and are likely to cause substantial injury to Plaintiffs which injury is not and was not reasonably avoidable by Plaintiffs in light of Defendants' exclusive knowledge and concealment of the phone connections fees, billing practices, phone usage rates, and refund policy and is not outweighed by the practices' benefits, if any, to Plaintiff and Class members. Such conduct is ongoing and continues to this date.

142. Defendants' acts and practices of omitting the Material Facts in connection with the sale of telephone services offends an established public policy favoring disclosure of material information in consumer transactions, and disclosure of phone usage rate information in telecommunication transactions in particular in advance of the purchase of the phone services and the initiation of the transactions, and/or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Furthermore, these acts and practices threaten an incipient violation of antitrust laws and/or consumer protection statutes, or violate the policy and spirit of one of those laws because the effect of the acts and practices are comparable to or the same as a violation of the law or otherwise significantly threaten or harm competition.

143. Defendants' acts of omitting the Material Facts are anticompetitive because consumers are lured into paying BBG's rates over those of other pay phone service providers, or their own wireless communications providers, which are lower than the charges imposed by BBG.

163120

144.     Defendants' acts and practices of omitting the Material Facts cause significant harm to consumers and entities.   BBG's reasons, justifications, and motives, if any, do not outweigh the gravity of the harm to its victims.

145. Defendants' acts and practices are **<u>unlawful</u>** because they violate California Civil Code §§ 1670.5 and 1750 et. seq., Cal. Bus. & Prof. Code § 17900 et seq., and 47 C.F.R. § 42.10 subsections (a) and (b), and 47 C.F.R. § 63.10(c).

146.     Defendants violate Cal. Civil Code § 1750 *et seq*. as alleged throughout this Complaint and in the Second Cause of Action incorporated by reference hereto.

147.     Defendants violate Cal. Civ. Code § 1670.5 by imposing unconscionable terms in the implied contract formed between Class members and BBG.  The unconscionable terms include the connection fees and unreasonably high per-minute phone usage rates.  The terms are both procedurally and substantively unconscionable.

148.     The terms are procedurally unconscionable because they are not disclosed prior to initiation of a phone call through BBG's services and systems.  Furthermore, BBG is in a superior bargaining position to consumers and the fees and rates are "offered" (albeit never disclosed) on a take-it or leave-it basis, often in situations where a consumer is unfamiliar with the process of making the call or performing a credit or debit phone call for the first time, such as a soldier returning home from war through a foreign airport.  Consumers are oppressed by the lack of negotiation or meaningful choice.  As in the case of Mr. Wood, BBG made no disclosure of the fact that it even serviced the telephone.  Mr. Wood never saw the terms, let alone was he able to negotiate them.  Because of the lack of disclosure of even the fact that BBG serviced the telephone, Mr. Wood had no meaningful choice.  Had BBG disclosed the Material Facts, Mr. Wood would have been fully informed of BBG's charges and opted to use alternative telecommunication services, such as the same telephone using HKBN as the long distance service provider, and paying HKBN's substantially lower rates.  To the extent BBG makes any of the Material Facts available, which it does not and did not in the case of Mr. Wood, they are buried in a manner calculated to maximize the likelihood that a consumer would not find them.

163120

149.    Without question, and as evidenced by the many complaints received by BBG, as well as the hundreds of consumer complaints to the BBB, the terms of BBG's implied contract are oppressive, hidden, and "surprise" consumers once they first see them. The terms are beyond the reasonable expectations of consumers as consumers have come to expect low rates, the absence of connection fees, and do not expect to be charged for calls that are initiated but never connected.  In the case of Mr. Wood, BBG did not disclose its rates or connection fees at any point in the transaction.  No operator, automated or live, prompted him to press "0" for connection fee or rate information at any point during the transaction.  Mr. Wood understood that he would not be charged a connection fee and that the rate for his calls would not be as high as US$4 per minute based on the only representations available on the phone he used.  Mr. Wood had no indication who charged him for his calls from Hong Kong, and upon researching and finding ISC he was surprised by the connection fees and rates he was charged when he first learned of them upon calling ISC's call center.

150.    The terms are substantively unconscionable because they are one-sided in favor of BBG and undoubtedly "shock the conscience" of a reasonable person and produce harsh results. Substantive unconscionability is supported by number of objective complaints registered against BBG, which include charging for calls that are initiated, but never connect to another telephone. In the case of Mr. Wood, BBG unilaterally imposed charges Mr. Wood never agreed to pay in amounts that no reasonable person would expect to pay. The charges BBG imposes for a call lasting just a few minutes amount to more than consumers pay for months of calling services for their landlines and cell phone plans, which often include long distance at no charge, or at rates amounting to pennies per minute, and the absence of any connection fees.  Indeed, the fact that one can make a free video call to anyone anywhere in the world using a computer and internet connection makes BBG's undisclosed connection fees and rates all the more shocking in this modern world of competition.  BBG's rates are not set by the free market as a free market depends on the free flow of information.  BBG conceals the information necessary for the free market to

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   work.  No reasonable person would pay BBG's connection fees and rates if BBG were to disclose

2   to callers prior to initiation of calls.

3        151.    Defendants violate Cal. Bus. & Prof. Code § 17900 et seq. by using unregistered

4   fictitious business names such as "CALL FROM CHINA."  Bus. & Prof. Code § 17900(a)(1)

5   explains that the purpose behind requiring registration of fictitious business names under § 17910

6   is to protect consumers against companies operating under fictitious business names.  BBG uses

7   fictitious business names to frustrate consumers' efforts to seek redress for its unlawful charges.  It

8   was only through Plaintiff Wood's persistent and time consuming research that he was able to

9   identify ISC.  Thus one fictitious business name led him to another.  It was only through the

10  assistance of his attorneys that he was ever able to connect the fictitious business name on his

11  credit card statement with the perpetrator of the fraud – BBG Communications, Inc.  Therefore,

12  BBG's intentional use of an unregistered fictitious business names is misleading and calculated to

13  disguise BBG as the legally accountable wrongdoer.

14       152.    Defendants violate 47 C.F.R. § 63.10(c) by not complying "with all applicable

15  disclosure and maintenance of information requirements of" 47 C.F.R § 42.10.

16       153.    Defendants violate 47 C.F.R. § 42.10(a) by not specifying that rate information is

17  available and the manner in which the public may obtain the information following a complaint

18  from Plaintiff and Class members concerning rates, terms, and conditions for BBG's services.

19       154.    Defendants violate 47 C.F.R § 42.10(b) because none of the internet websites that

20  they maintain or maintained, including, but not limited to www.bbgusa.com, www.bbgcomm.com,

21  www.internationalsatellitecom.com, www.bbgcommch.com makes "its current rates, terms and

22  conditions, for all of its international and interstate, domestic interexchange services" available

23  online.

24       155.    Defendants' acts and practices are **fraudulent** in that they have deceived and/or

25  are likely to deceive Plaintiff and Class members.  Defendants knowingly sold telephone services

26  without disclosing Material Facts.  To the extent Defendants maintain that they did not omit the

27

28

Material Facts, but made full disclosure of fees and rates, such disclosure is couched in such a manner as to be misleading.

156.     Plaintiff and Class members relied upon Defendants' unfair, unlawful, and fraudulent business acts and practices to their detriment in that they would not have purchased Defendants' services had Defendant disclosed the Material Facts.

157.     Plaintiff and Class members have suffered injury and have in fact lost money as a result of Defendants' unfair competition in that they have overpaid for telephone services or would not have purchased the telephone services had Defendant disclosed the Material Facts.

158.     Plaintiffs seek an order of this Court awarding restitution, injunctive relief and all other relief allowed under Section 17200, *et seq.,* plus interest, attorneys' fees, and costs.

## SECOND CAUSE OF ACTION
### (Violations of the California Consumer Legal Remedies Act)

159.     Plaintiff repeats and re-alleges all prior paragraphs and incorporates them as if fully set forth herein.

160.     Plaintiff seeks to recover damages and/or restitution, as well as injunctive relief for Defendants' violations of the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 *et seq.*

161.     At all times relevant hereto, Plaintiff and members of the Subclass were and are "consumer(s)" as that term is defined in Cal. Civ. Code § 1761(d).

162.     At all times relevant hereto, Defendants' telecommunications services constituted "services" as that term is defined in Cal. Civ. Code § 1761(b).

163.     At all times relevant hereto, Defendants constituted "person(s)" as that term is defined in Cal. Civ. Code § 1761(c).

164.     At all times relevant hereto, Plaintiff's and Class members' purchases of Defendants' telecommunication services constituted a "transaction" as that term is defined in Cal. Civ. Code § 1761(e).

165.     The CLRA provides, in relevant part, that "[t]he following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful: subsection (5) Representing that services . . . have . . . characteristics, uses, benefits . . . which they do not have; ... subsection (7) Representing that services ... are of a particular standard, quality or grade . . . if they are of another; subsection (9) Advertising services ... with intent not to sell them as advertised; subsection (14) representing that a transaction confers rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; subsection (16) representing that a transaction has been supplied in accordance with a previous representation when it has not; and subsection (19) inserting an unconscionable provision in the contract.  Civil Code §§ 1770(a)(5),(7),(9), (14), (16), and (19).

166.     Defendants misrepresented, by omission, that their telecommunications services had characteristics, uses, and/or benefits they do not have.  Specifically, Defendants' omissions deceived Plaintiff and Class members into believing that the characteristics, benefits, and uses of Defendants' services were performed at conventional phone usage rates, without connection fees, billed in per minute increments, and there was no charge for unconnected calls.

167.     Defendants misrepresented, by omission, that their telecommunications services were of a particular standard, when in fact, they charge unheard of connection fees and rates.

168.     Defendants falsely advertised, by omission, their telecommunication services by not disclosing the Material Facts.

169.     Defendants misrepresented, by omission, that the transactions conferred rights, remedies, or obligations which they did not have, such as the right or remedy of seeking a refund/rebate under Defendants' secret refund policy upon complaining vociferously to an International Satellite Communications/BBG customer service representative about its unconscionable and fraudulent charges.  Defendants misrepresented, by omission, that the transaction involved certain obligations, such as a connection fee and minimum charge such as 5 minutes at $5 per minute, for example.

170.     Defendants misrepresent to Plaintiff and Class members who call an International Satellite Communications/BBG customer service representative that the accurate connection fees and rates are disclosed on the phones or by operators, when in fact they are not, thereby misrepresenting that the telecommunication services were supplied in accordance with a previous representation when they were not.

171.     Defendants insert an unconscionable provision into the agreement between themselves and consumers by imposing procedurally and substantively unconscionable connection fees and per-minute phone usage rates, as more fully described under the First Cause of Action as an "unlawful" violation which is incorporated by reference hereto.

172.     The Material Facts, as alleged above, are contrary to representations Defendants actually made on written communications adhered to telephones serviced by Defendants throughout the world that stated Defendants would charge users inexpensive phone usage rates.

173.     In addition, Defendants were obliged to disclose the omitted Material Facts because: 1) Defendants had exclusive knowledge of the Material Facts, and they were not known to Plaintiff and the Class, since only Defendants knew of the connections fees, per minute phone usage rates, billing policies, and refund policies; 2) Defendants actively concealed and suppressed the Material Facts from Plaintiffs by not disclosing the connection fees, per-minute phone usage rates, billing policies and/or refund policies; and 3) BBG also makes partial representations by stating inexpensive phone usage rates on some telephones through its own representations or those of its joint venturers, but suppresses other material information such as significant connection fees, billing policies, actual phone usage rates, charges, and rebate/refund policies.

174.     Plaintiff and Class members justifiably relied to their detriment upon the concealment and/or non-disclosure of Material Facts as evidenced by their purchase of Defendants' telecommunications services.   Had Plaintiff and Class members known of the Material Facts, they would not have purchased Defendants' services and/or would have purchased or used alternative telecommunication services.   As such, Plaintiff and Class members did not receive the benefit of the bargain they struck with Defendants.   Also, some putative class members

**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

did not receive the benefit of the bargain because they were charged connection fees and a minimum number of minutes for calls that were never connected.

175.    Pursuant to Cal. Civil Code § 1780, Plaintiff prays for actual damages and/or restitution, as well as an order enjoining Defendants from concealing the Material Facts.  Plaintiff and Class members are entitled to recover costs, and attorney's fees pursuant to Cal. Civil Code §§ 1780(e).

176.    Plaintiff sent a demand letter to Defendants. See Ex. 9. More than 30 days have elapsed since Defendants' receipt of Plaintiff's demand letter and Defendants have not responded nor have they complied with Cal. Civ. Code § 1782(c).

## FOURTH CAUSE OF ACTION

### (Money Had and Received, Money Paid, and Restitution/Unjust Enrichment)

177.    Plaintiff repeats and re-alleges all prior paragraphs and incorporates them as if fully set forth herein.

178.    At all times relevant hereto, Defendants sold telecommunication services through implied-in-law agreements.

179.    Plaintiff and Class members conferred a direct benefit upon Defendants by paying monies originally in Plaintiff's and Class members' possession to Defendants for telecommunication services.

180.    Defendants demanded payment of such monies under compulsion or mistake of fact.

181.    Defendants received, retained or appropriated Plaintiff's and Class members' monies under such circumstances, as described in more detail herein, that would make it inequitable and unjust for Defendants to retain.

182.    As a result of Defendants' misconduct, Defendants became indebted to Plaintiff and Class members for the sums of money improperly demanded and paid to Defendants.

183.    As a direct and proximate result of Defendant's misconduct, Plaintiff and Class members have suffered injury and damages in that they have overpaid for Defendants' services or

163120

would not have purchased them if the circumstances under which they did pay for them were not unjust.  Plaintiff seeks an order imposing a constructive trust on all monies wrongfully obtained and/or retained by Defendants, and to have such monies returned to Plaintiff and Class members with pre and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants for the following:

1.  An order certifying this action as a class action, and appointing Nicolas Wood as representative plaintiff and his counsel, Stuart M. Eppsteiner and Andrew J. Kubik of Eppsteiner & Fiorica Attorneys, LLP to be class counsel;

2.  A constructive trust on and restitution of all amounts obtained by Defendants as a result of their misconduct, together with interest thereon from the date of payment, to the victims of such violations;

3.  All recoverable compensatory, punitive, and other damages sustained by Plaintiff and Class members;

4.  Actual and/or statutory damages for injuries suffered by Plaintiff and Class members in the maximum amount permitted by applicable law;

5.  An order enjoining Defendants' wrongful, unlawful, fraudulent, deceptive, and unfair conduct as set forth above;

6.  Statutory pre-judgment and post-judgment interest on any amounts;

7.  Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

8.  Such other relief as the Court may deem just and proper.

Plaintiff, individually and on behalf of all similarly situated persons, hereby demands a trial by jury on all issues so triable.

**FIRST AMENDED CLASS ACTION COMPLAINT**

163120

DATED:  April 15, 2011                          EPPSTEINER & FIORICA ATTORNEYS, LLP


                                                By:      /s/  Stuart M. Eppsteiner
                                                        Stuart M. Eppsteiner, Esq.
                                                        Andrew J. Kubik, Esq.

                                                        Counsel for Plaintiffs and the Putative Class

**FIRST AMENDED CLASS ACTION COMPLAINT**

163120