# EXHIBIT 1

FEDERAL COMMUNICATIONS COMMISSION
Washington, D.C. 20554

November 2, 2010

Andrew J. Kubik
Eppsteiner & Fiorica Attorneys, LLP
12555 High Bluff Drive, Suite 155
San Diego, CA 92130

Re:    Freedom of Information Act Request
       Control No. 2010-577

Dear Mr. Kubik:

This responds to your Freedom of Information Act (FOIA) request received by the Federal Communications Commission's (Commission's) FOIA Office via the Internet on September 20, 2010. Your request was assigned FOIA Control No. 2010-577, and referred to the Wireline Competition Bureau for processing.

In your request, you ask that we produce:

1. The filed rates for International Satellite Communications (http://www.Internationalsatellitecom.com/) and BBG Communications Inc. (http://www.bbgcomm.com/); and

2. Copies of any complaints received by the CPUC[1] regarding International Satellite Communication and/or BBG Communications Inc.

Regarding Item No. 1 of your request, our search located no tariff filings with respect to International Satellite Communication. Our database indicates that BBG Communications Inc. filed a tariff with the FCC, effective November 1, 1997. After an exhaustive search, however, we are unable to locate the requested record. We suspect this is primarily due to the detariffing of most domestic and international long distance services. Please be aware that the Commission adopted rules requiring the detariffing of most domestic long distance services as of July 31, 2001, and the detariffing of most international long distance services as of January 28, 2002. Further tariff filings for most domestic and international services are prohibited after those dates. This means that carriers are now the primary sources for information regarding the rates and terms of their offerings. It is now generally more expedient to contact the carriers directly to obtain current rate and term information, and you may wish to do so in this case. In fact, our rules require carriers, if they maintain an Internet website, to include rate and service information on-line. As a courtesy, enclosed are copies of the Commission's releases addressing this matter.

---

[1] After speaking with Jocelyn Frye of the Wireline Competition Bureau for the purpose of clarifying your request, in an e-mail dated October 19, 2010, you amended Item No. 2 of your request to "read 'FCC' instead of 'CPUC'." On that date, you also consented to extending the due date for responding to your FOIA request to November 2, 2010. *See* E-mail from Andrew J. Kubik to Jocelyn Frye, FCC, dated October 19, 2010.

Exhibit 1 Page 2

Page 42

The Commission does not maintain records containing the type of information described in Item No. 2 of your request and, therefore, we are unable to grant that portion of your request.

Pursuant to our FOIA rules, you are designated as an "All Other" requester. [2] Requesters who fall into this category are billed for search time plus the cost of reproduction, except that the first two hours of search time and the first 100 pages of reproduction are furnished without charge. The cost to process your request falls within these limits, so there is no charge for your FOIA request.

Under Section 0.461(j) of the Commission's rules you may file an application for review of the Bureau's handling of your FOIA request. [3] The deadline for filing an application for review is 30 days from the date of this letter. [4] Any such application must be submitted to the FCC's Office of General Counsel, must contain "Review of Freedom of Information Act Action" in its caption and on the transmitting envelope, [5] and should reference FOIA Control Number 2010-577.

Sincerely,

Kirk S. Burgee
Chief of Staff
Wireline Competition Bureau

Enclosures

---

[2] *See* 47 C.F.R. § 0.470.

[3] *See* 47 C.F.R. § 0.461(j).

[4] *Id.*

[5] *Id.*

Exhibit 1 Page 3

Page 43



Text | Word97
Statements: Ness | Furchigott-Roth

# FCC NEWS

**Federal Communications Commission**
445 12th Street, S.W.
Washington, D.C. 20554

News media information 202 / 418-0500
Fax-On-Demand 202 / 418-2830
Internet: http: www.fcc.gov
TTY: 202/418-2555

This is an unofficial announcement of Commission action. Release of the full text of a Commission order
constitutes official action. See MCI v. FCC. 515 F 2d 385 (D.C. Circ 1974).

FOR IMMEDIATE RELEASE
March 16, 2001

NEWS MEDIA CONTACT:
Chris Murphy at 202-418-2373
Email: cmurphy@fcc.gov

## FCC ADOPTS DETARIFFING AND STREAMLINING MEASURES REGARDING INTERNATIONAL INTEREXCHANGE SERVICES

Washington. D.C. – The Federal Communications Commission (FCC) took action today to
promote further deregulation of international long distance services. As part of its Biennial
Regulatory Review under Section 11 of the Communications Act. the Commission adopted a
Report and Order that cuts red tape for most providers of international telephone services and
provides benefits to consumers.

The Commission's Order eliminates the significant regulatory burden that non-dominant
carriers file tariffs for most international interexchange services. The Commission previously
adopted similar rules requiring the detariffing of most domestic services.

Specifically, the Commission concludes in the Order that competitive conditions in the
international market are now such that tariffs are no longer necessary to protect consumers and
promote competition. Therefore. the Order concludes that the Communications Act requires the
Commission to forbear from the tariffing requirements in Section 203 of the Act as they apply
to non-dominant carriers providing international interexchange services. The tariffing
requirements will continue to apply a small category of carriers (e.g.. those that are classified
as dominant for reasons other than an affiliation with a foreign carrier that possesses market
power).

In addition to reducing regulatory burdens. the Commission's actions will produce significant
consumer benefits. Eliminating the tariffing requirement will pave the way for consumers to
enter into contracts directly with telephone carriers for their international services. as they
currently do for other services provided by unregulated industries. The action also will remove
the harmful effects to consumers of the "filed rate doctrine." the practical effect of which is to
permit carriers to alter unilaterally the rates. terms. and conditions for services by relying on
tariffs filed with the Commission.

To ensure that consumers have access to rate information in an easy-to-understand format. the
Commission requires carriers to make rate and service information available to the public in at
least one location during regular business hours and those carriers that maintain Internet
websites to post this information on-line. In addition. the Order requires carriers to maintain
price and service information for each of their international offerings for two years and six
months after they cease to provide the offering. This requirement will assist the Commission in
monitoring compliance with provisions of the Communications Act and the Commission's

Exhibit 1 Page 4

Page 44

rules requiring that rules be reasonable and not unreasonably discriminatory.

The Commission retains tariffing requirements for four types of international service for which it would be impossible or impracticable for carriers to establish contractual relationships with customers. The four types of service are: international dial-around services; inbound international collect calls; "on-demand" Mobile Satellite Services; and, for services to new customers that choose their long distance provider through their local service provider (for the first 45 days of service or until there is contract between the customer and the long distance provider, whichever occurs first).

The Commission provides a transition period of nine months from the effective date of the Order to permit carriers time to adjust to detariffing. At the end of the transition period, carriers must be in compliance with the detariffing rules. During this nine-month period, carriers may, but are not required to, detariff their international services. Pursuant to separate Commission action, carriers are required to detariff domestic services by July 31, 2001. The Commission expects that many carriers will decide to detariff both their domestic and international services at the same time.

In addition to its action on the tariffing requirements, the Commission clarifies, as part of its Biennial Regulatory Review, that the scope of the Section 43.51 filing requirement is limited to a small class of contracts. Specifically, the Commission further reduces the regulatory burden on non-dominant carriers by clarifying that the contract filing requirement in Section 43.51 of the Commission's rules applies solely to: (1) carriers classified as dominant for reasons other than foreign affiliation; and (2) carriers, whether classified as dominant or non-dominant, contracting directly for services with foreign carriers that possess market power.

Action by the Commission, March 16, 2001, by Report and Order (FCC 01-93). Chairman Powell, Commissioners Ness and Tristani, with Commissioner Furchtgott-Roth concurring and Commissioners Ness and Furchtgott-Roth issuing statements.

-FCC-

International Bureau Contact: Kathryn O'Brien at 202-418-0436.

IB Docket No. 00-202

Exhibit 1 Page 5

of 2

Page 45

Federal Communications Commission          FCC 01-93

## PART 64 – MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

20.  The authority citation for part 64 continues to read as follows:

Authority:  47 U.S.C. 151, 154, 201, 202, 205, 218-220,and 332 unless otherwise noted.

21.  Section 64.1001 is amended by revising paragraph (b) to read as follows:

§ 64.1001 International settlements policy and modification requests.

*****

(b)  If the international settlement arrangement in the operating agreement or amendment referred to in § 43.51(e)(1) or (e)(2) of this Chapter differs from the arrangement in effect in the operating agreement of another carrier providing service to or from the same foreign point, the carrier must file a modification request under this section unless the international route is exempt from the international settlements policy under § 43.51(e)(3) of this Chapter.

*****

## SEPARATE STATEMENT OF

## COMMISSIONER SUSAN NESS

*Re:*     *2000 Biennial Regulatory Review; Policy and Rules Concerning the International, Interexchange Marketplace (IB Docket No. 00-202)*

56

Exhibit 1 Page 6

Page 46

Federal Communications Commission                    FCC 01-93

Today's decision to eliminate unnecessary tariff filing requirements underscores our commitment to deregulate whenever there is competition and consumers are protected. Carriers providing international services – like those providing domestic long distance services -- will now establish contractual arrangements with their customers just as virtually every other business in this country.

I also support our decision to require that carriers make public information about the rates and terms of their offerings. Competition has provided consumers with a dizzying array of services and calling plan options. Consumers often find carriers' marketing and billing information confusing and difficult to understand.

Public disclosure of rates and terms will increase the availability of information so that consumers can choose the telecommunications services that best meet their individual needs. Consumers will have a powerful tool to shop around and compare rates, thereby leading to more informed decisions, and fewer unpleasant surprises when the bill arrives.

Consumers today can log onto a website, input their calling patterns, and receive a comparison of the interstate rates they would pay under different plans. The public disclosure requirement ensures that consumer organizations continue to have access to the information necessary to provide and expand such services to consumers.

Economists generally agree that consumer access to accurate information is vital for the efficient functioning of competitive markets. I am pleased that this decision provides for such access. As a result of today's action, I expect competition in the international services market to intensify and consumers to reap the benefits.

## CONCURRING STATEMENT OF

## COMMISSIONER HAROLD FURCHTGOTT-ROTH

Re: Policy and Rules Concerning the International, Interexchange Marketplace, 2000 Biennial Regulatory Review, IB Docket No. 00-202 , Report and Order (adopted March 16, 2001).

57

Exhibit 1 Page-7

Page 47

I fully support today's decision to detariff the vast majority of international telecommunications services. However, as I stated at the NPRM stage of this proceeding, I fear that today's Order perpetuates some flawed tariff policies that harm consumers and hinder full and efficient development of the marketplace.[234]

As a general matter, I continue to object to the imposition of ineffective and burdensome rules in the international context based on the purported need for symmetry with the domestic detariffing item. I believe the better approach would have been to eliminate these obligations internationally now and call for comment on changing these requirements domestically. I am hopeful that the Commission will revisit all of these obligations as soon as practicable.

Our current international tariffing policies simply do not square with market realities. First and fundamentally, I do not believe tariffs are a useful regulatory tool in a competitive marketplace. Indeed, our permissive detariffing approach to some offerings only serves to block consumer claims under the filed rate doctrine. Telecommunications consumers should be entitled to the full panoply of rights that consumers in other competitive markets enjoy. In this regard, competitive markets are driven in part by consumer price comparison. Thus carriers have every incentive to disclose (and indeed advertise) their rates.[235] Today's item assumes the opposite – by creating a government mandate for disclosure both on the web and in one physical location in the country.[236] Similarly today's order imposes an unnecessary record keeping requirement on international carriers. Under today's order, carriers must maintain records for all international service offerings for a period of at least two years and six months.[237] The item justifies this obligation based on the need to have readily available information in the event a complaint is filed (for example under sections 201 and 202 of the Act). Yet CMRS carriers are subject to the same complaints, and we have no parallel obligation on those providers. Carriers are well aware of their potential liability. If they were to dispose of these records in an irresponsible fashion, I have no doubt of the Commission's ability to take appropriate action in a complaint case. Thus there appears to be little need to create another document retention obligation.

In general today's item is simply too eager to mandate, and too reluctant to examine the utility of the underlying rules. In a quickly evolving and competitive marketplace, consumers and carriers will be better served by a regulator that intervenes only when necessary – and focuses its discrete resources on tackling the true problems instead of creating mandates to solve imaginary ones.

---

[234] See Concurring Statement of Commissioner Harold W. Furchtgott-Roth, *In the Matter of 2000 Biennial Regulatory Review Policy and Rules Concerning the International, Interexchange Marketplace*, IB Docket No. 00-202, Notice of Proposed Rulemaking, FCC 00-367 at 42 (rel. Oct. 18, 2000) (urging complete detariffing of international carriers and reexamination of policy of permissive detariffing for domestic carriers).

[235] A quick examination of international carriers websites reveals that carriers prominently advertise rate information even in today's tariffed environment.

[236] See ¶ 47. The ineffectiveness of physical location requirement is self-evident. The idea that consumers will trek to the physical office of a carrier in order to gather rate information is bizarre.

[237] See ¶ 52.

Exhibit 1 page 8

# EXHIBIT 2

NCIC's request for voluntary attendance at deposition                                    Page 1 of 2

## Tawnya Wojciechowski

**From:** Michel Alexiev [michel.alexiev@bbgcomm.com]

**Sent:** Wednesday, September 08, 2004 9:52 AM

**To:** Tawnya Wojciechowski

**Subject:** Re: NCIC's request for voluntary attendance at deposition

Dear Tawnya,

Following our communication with Mr. Gallcot during the past months, as well as on the basis of the request by NCIC, please be advised as follows:

We do not really feel the necessity to appear in defense of NCIC as requested, but as a courtesy to Mr. Gallcot we are willing to consider this. Our appearance would be contingent of the following precedent:

- NCIC to pledge unconditionally and irrevocably not to sue Messrs. Alexiev under any circumstance;
- NCIC to reimburse Messrs. Alexiev for all travel and lodging expenses;
- NCIC to pay Messrs. Alexiev overdue commissions from May 2003 in the amount of US$ 16,000;
- NCIC unconditionally not to compete or try to compete, directly or indirectly, signed up by Messrs. Alexiev or Benchmark Project Management s.r.o. till date.

Kind regards,

Michel and Goran Alexiev

----- Original Message -----
From: Tawnya Wojciechowski
To: goran@caramba.cz
Sent: Tuesday, September 07, 2004 12:04 AM
Subject: NCIC's request for voluntary attendance at deposition

Dear Mssrs. Alexiev:

Please see the attached letter and give me your response at your earliest convenience.

Tawnya R. Wojciechowski, Esquire
Sheppard, Mullin, Richter & Hampton LLP
650 Town Center Drive, Fourth Floor
Costa Mesa, California 92626
phone (714) 424-2828
cell: (949) 295-3996
fax (714) 513-5130
email: tawnya@sheppardmullin.com

<<41366774_1.DOC>>

9/8/2004

Exhibit 2 Page 2

# EXHIBIT 3

# BBG Privacy Policy

### Privacy Policy Scope

This Privacy Policy identifies and describes the way BBG uses and protects the information we collect about Customers and Users. All use of BBG's products and services, as well as visits to our Web sites, are subject to this Privacy Policy.

### The information We Collect, How we Collect It, And How We Use It

We collect different types of personal and other information based on the use of our products and services and our business relationship with our customers. Some examples include:

- *Contact Information* that allows us to communicate with our customer -- including names and telephone numbers.
- *Billing information* related to our customer financial relationship with us -- including customer payment data, credit card number, security codes and Dates;

We collect information in three primary ways:

- The customer gives it to us when he purchase or interact with us about a product or service we offer or provide;
- We collect it automatically when the customer use our products and services;
- We obtain it from other sources, such as from Non-BBG companies that require our services.

All this information is stored in our Sites located in San Diego, Ca. And Las Vegas.

We use the information we collect in a variety of ways, including to:

- Provide our customers with the best customer experience possible;
- Provide the services our customer is purchase, and to respond to their questions;
- Investigate, prevent or take action regarding illegal activities, violations of our Terms of Service or Acceptable Use Policies; and
- For billing purposes.

### Information Sharing

With Non-BBG Companies: We share Customer Personal Information only with non-BBG companies that perform services on our behalf, and only as necessary for them to provide those services to our customers.

- We require those non-BBG companies to protect any Personal Information they may receive in a manner consistent with this policy.
- We do not provide Personal Information to non-BBG companies for the marketing of their own products and services.

In Other Circumstances: We may provide Personal Information to non-BBG companies or other third parties for purposes such as:

- Obtaining payment for our products and services, including the transfer or sale of delinquent accounts to third parties for collection

Exhibit 3 Page 2

Page 52

**Safeguarding Customer Information: Our Policy on Data Protection and Security**

- We do not sell our Customer Personal Information to anyone for any purpose. Period.
- We maintain information about our customers in our business records while is our customer, or until it is no longer needed for business, tax, or legal purposes.
- We have implemented encryption and other appropriate security controls to protect Personal Information when stored or transmitted by BBG.
- We store all this information on our main site located in San Diego, Ca. And Las Vegas US.
- We require non-BBG companies acting on our behalf to protect any Personal Information they may receive in a manner consistent with this Policy. We do not allow them to use such information for any other purpose.

Exhibit 3 Page 3

Page 53

# EXHIBIT 4

 **BBGcommunications**    WORLDWIDE COMMUNICATIONS



Search

| HOME | COMPANY | SERVICES | TECHNOLOGY | CLIENTS | INDUSTRY NEWS | PARTNERSHIPS | CONTACT US |

**Quick Contact Form**

Company Name*

Your Phone Number*

Your Email*

Your Message*

SEND MESSAGE

**Company Location**

BBG Communications
1658 Galles Boulevard, San Diego,
CA, 92154
Phone: 1.619.661.6661

# BBG's Safe Harbor Privacy Policy

## Policy Statement

BBG Communications, Inc. and its affiliates (collectively "BBG"), respect the privacy and values the confidence of our customers, employees and others who entrust us with their personal information. For this reason, BBG adheres to the set of data protection principles developed by the United States Department of Commerce and the European Commission and the Frequently Asked Questions issued by the Department of Commerce on July 21, 2000 (the "Safe Harbor Principles").

## Scope

BBG provides international telecommunications services, including public telephony, calling card, long distance operator assistance, credit card processing, billing, collection and wireless telecommunication services.

BBG processes casual-use voice services from European Union ("EU") telephone users making long distance calls from payphones and hotels. This process includes the collection of billing information and desired call destination from end users which eventually result in the creation of call detail records and include the date, time, duration, number dialed and billing number. This call detail information is collected from EU telephone equipment operators, and local and long distance carriers and is used by BBG for calculating commissions and reporting this information via a secured website to sales representatives and customers; otherwise the information is restricted to authorized personnel, technical staff and network administrators. Call detail records do not contain personally identifiable information. An individual's name and credit card number are collected when calls are billed to a credit card, and BBG processes the payment and charges the caller's credit card. Certain related entities in the EU have als contracted with BBG to provide telecommunications support services and may also submit human resource information to BBG which is used only for internal purposes, stored in a secure location and not shared with third parties.

This policy (the "Policy") applies to all Personal Information (defined below) received by BBG regardless of format. BBG will not share or disclose Personal Information with third parties unless required to do so by law and will establish and maintain business procedures that are consistent with this Policy.

Next Page

**BBG Technology**

G-Tel, a BBG strategic partner, has become the first Latin American company to offer Point to Multi-Point...

LEARN MORE

**BBG Clients**

BBG's clients come in a wide range of fields, and their needs are ever changing. With technology constantly evolving, our....

LEARN MORE

**BBG Services**

BBG offers a wide selection of products and services that can be custom fit to your business. Our business is organized...

LEARN MORE

BBG Communications
1658 Galles Boulevard
San Diego, CA, 92154

Phone: 1.619.564.3640
Email: info@bbgcomm.com

 **BBGusa.com**

Copyright © 2008 BBG Communications visit our Terms of Use for more information.
Home | Directory Listing | Services | BBG Technology | Clients | Blog | Communications Industry
Working With Us | BBG 2008 | Privacy Policy | Contact Us

Exhibit 4 Page 2

 **BBGcommunications**   WORLDWIDE COMMUNICATIONS

    Search

| HOME | COMPANY | SERVICES | TECHNOLOGY | CLIENTS | INDUSTRY NEWS | PARTNERSHIPS | CONTACT US |

### Quick Contact Form

Company Name*

Your Phone Number*

Your Email*

Your Message*

[SEND MESSAGE!]

### Company Location

BBG Communications
1658 Gailes Boulevard, San Diego,
CA, 92154
Phone: 1.619.661.6661

## Privacy Policy...continued

### Safe Harbor Principles

BBG has adopted the seven Safe Harbor Principles of notice, choice, onward transfer (transfer to third parties), access, security, data integrity and enforcement with respect to individual name and credit card number information and human resource data to be transferred to the U.S. from operations in the EU ("Personal Information").

1. Notice: This Policy informs individuals about the purposes for which we collect and use Personal Information, how to contact us, the parties to which that information may be accessible, and the choices and means, if any, that BBG offers individuals for limiting the use and disclosure of such data.

2. Choice: BBG does not share individual names and/or credit card numbers with third parties, or use such data for a purpose other than the purpose for which it was originally collected, such as in connection with payment processing and authorization involving financial institutions and processing companies. For human resource data, BBG does not share such information with third parties or use such information for a purpose other than that for which the data was originally collected or subsequently authorized by the individual. As BBG does not share Personal Information with third parties, there is no need to offer individuals the opportunity to opt-out from having such data disclosed. Should the need ever arise, BBG will provide individuals with reasonable mechanisms to exercise their choice to opt-out from having such data disclosed.

3. Onward Transfer (Transfer to Third Parties): Prior to disclosing Personal Information to a third party (other than as disclosed in this Policy), should the need ever arise, BBG will apply the notice and choice principles detailed above. BBG will obtain assurances from third parties that they will safeguard the personal data consistently with this Policy or any other EU adequacy finding, or as an alternative, BBG may enter into a written agreement with such third party requiring that the third party provide at least the same level of personal data protection as is maintained by BBG.

4. Access: Upon request, BBG will grant individuals reasonable access to Personal Information that it holds about them and BBG will take reasonable steps to permit individuals to correct, amend or delete information that is demonstrated to be inaccurate or incomplete.

5. Security: BBG will take reasonable precautions to protect Personal Information in its possession from loss, misuse and unauthorized access, disclosure, alteration and destruction.

6. Data Integrity: BBG will use Personal Information only in ways that are compatible with the purpose for which it was collected or subsequently authorized by the individual. BBG will take reasonable steps to ensure that Personal Information is reliable for its intended use, accurate, complete and current.

7. Enforcement: BBG will assure compliance with the Safe Harbor Principles by: (I) committing to investigate and attempt to resolve complaints regarding violations of its published privacy policy directly with the complainant, and in the events that the complaint cannot be resolved by BBG internally, the complainant may submit the matter to binding arbitration before the American Arbitration Association in San Diego, California; (ii) having an assessment procedure, whereby outside compliance audits (in connection with internal audits) will be conducted; and (iii) subjecting its employees who violate this Policy to discipline.

Contact Our Policy Deparment

### BBG Technology

G-Tel, a BBG strategic partner, has become the first Latin American company to offer Point to Multi-Point...

[LEARN MORE]

### BBG Clients

BBG's clients come in a wide range of fields, and their needs are ever changing. With technology constantly evolving, our...

[LEARN MORE]

### BBG Services

BBG offers a wide selection of products and services that can be custom fit to your business. Our business is organized...

[LEARN MORE]

BBG Communications
1658 Gailes Boulevard
San Diego, CA, 92154

Phone: 1.619.564.3640
Email: info@bbgcomm.com

 **BBGusa.com**

Copyright © 2008 BBG Communications visit our Terms of Use for more information.
Home | Directory Listing | Services | BBG Technology | Clients | Blog | Communications Industry
Working With Us | BBG 2008 | Privacy Policy | Contact Us

Exhibit 4 Page 3

# EXHIBIT 5



# Commercial register of canton Zug
# Internet full extract

| Identification number | Legal status | Entry | Cancelled | Carried 185567 from: |
|---|---|---|---|---|
| CH-170.3.029.593-2 | Limited or Corporation | 26.06.2006 | | on: |

Bestellungen

| In | Ca | Business name |
|---|---|---|
| 1 | | BBG Global AG |
| 1 | | (BBG Global SA) (BBG Global Ltd) |

| Ref | Legal seat |
|---|---|
| 1 | ~~Zug~~ |
| 2 | Baar |

| In | Ca | Share capital (CHF) | Paid in (CHF) | Shares |
|---|---|---|---|---|
| 1 | 8 | ~~52'760'000.00~~ | ~~52'760'000.00~~ | ~~527600 Namenaktien zu CHF 100.00~~ |
| 8 | | 2'004'880.00 | 2'004'880.00 | 501'220 Namenaktien zu CHF 4.00 |

| In | Ca | Company address |
|---|---|---|
| 1 | 2 | ~~c/o Bär & Karrer~~ ~~Baarerstrasse 8~~ ~~6301 Zug~~ |
| 2 | | Bahnhofpark 4 6340 Baar |

| In | Ca | Participation capital (CHF) | Paid in (CHF) | Participation certificates |
|---|---|---|---|---|
| | | | | |

| In | Ca | Purpose |
|---|---|---|
| 1 | 7 | ~~Erwerb, Verwaltung und Veräusserung von Beteiligungen an anderen Unternehmen im In- und Ausland; kann sich an anderen Unternehmen beteiligen, Vertretungen übernehmen, Finanzierungen für eigene oder fremde Rechnung vornehmen, insbesondere die Finanzierung von Beteiligungsgesellschaften sowie Garantien und Bürgschaften für verbundene Unternehmen und Dritte eingehen~~ |
| 7 | | Anbieten, Fördern und Erbringen von Dienstleistungen im Zusammenhang mit Telefon-Ferngesprächen, Internetzugang und wifi; vollständige Zweckumschreibung gemäss Statuten |

| In | Ca | Remarks |
|---|---|---|
| 7 | | Die Mitteilungen an die Aktionäre erfolgen brieflich, oder nach Ermessen des Verwaltungsrates durch eingeschriebenen Brief an die im Aktienbuch verzeichneten Adressen. |
| 8 | | Bei der Kapitalherabsetzung vom 20.09.2010 werden 26'380 eigene Namenaktien zu CHF 100.00 vernichtet und CHF 2'638'000.00 zur Wertberichtigung des Wertschriftenkontos eigene Aktien bzw. zur Aufhebung der für eigene Aktien gebildeten Reserve verwendet. Der Nennwert der verbleibenden 501'220 Namenaktien zu je CHF 100.00 wird auf CHF 4.00 herabgesetzt und CHF 96.00 pro Namenaktie an die Aktionäre zurückbezahlt. |

| Ref | Date of the acts |
|---|---|
| 1 | 19.06.2006 |
| 2 | 29.01.2007 |
| 7 | 28.04.2010 |
| 8 | 20.09.2010 |

| In | Ca | Qualified facts |
|---|---|---|
| 1 | | Sacheinlage: Sämtliche 12'000 Namenaktien zu USD 1.00 der BBG Holdings Ltd., in Hamilton (Bermudas) gemäss Sacheinlagevertrag vom 19.06.2006, wofür 527'600 Namenaktien |

| Ref | Official publication |
|---|---|
| 1 | SHAB |

| In | Ca | Qualified facts |
|----|----|-----------------|
|    |    | zu CHF 100.00 ausgegeben werden |

| In | Ca | Branch offices | In | Ca | Branch offices |
|----|----|----------------|----|----|----------------|
|    |    |                |    |    |                |

| Vis | Ref | No journal | Date | SOGC | Date SOGC | Page / Id |
|-----|-----|-----------|------|------|-----------|-----------|
| ZG  | 1   | 7616      | 26.06.2006 | 125 | 30.06.2006 | 21 / 3440876 |
| FUS | 2   | 1745      | 12.02.2007 | 33  | 16.02.2007 | 20 / 3780500 |
| LLU | 3   | B 5525    | 27.04.2007 | B 85 | 03.05.2007 | 16 / 3913822 |
| ZG  | 4   | 3302      | 25.02.2009 | 42  | 03.03.2009 | 23 / 4905988 |
| ZG  | 5   | 10908     | 03.07.2009 | 130 | 09.07.2009 | 36 / 5125068 |

| Vis | Ref | No journal | Date | SOGC | Date SOGC | Page / Id |
|-----|-----|-----------|------|------|-----------|-----------|
| ZG  | 6   | 15793     | 14.09.2009 | 181 | 18.09.2009 | 17 / 5253066 |
| ZG  | 7   | 6365      | 30.04.2010 | 87  | 06.05.2010 | 24 / 5620972 |
| ZG  | 8   | 17516     | 30.11.2010 | 237 | 06.12.2010 | 24 / 5925104 |

| In | Mo | Ca | Personal Data | Function | Signature |
|----|----|----|---------------|----------|-----------|
| 1  |    | 6m | Galicot, Gregorio, amerikanischer Staatsangehöriger, in San Diego (US) | president of the board of directors | joint signature at two |
| 1  |    | 4  | Tschopp, Dr. Felix, von Zollikon und Oberkirch, in Baar | member of the board of directors | joint signature at two |
| 1  |    | 4  | Meyer, Kurt, von Steinhausen und Wohlen AG, in Steinhausen | member of the board of directors | joint signature at two |
| 1  |    | 7  | Gestoval Société fiduciaire, in Carouge GE | auditor | |
| 2  |    | 3m | Urbino, Pilar, amerikanischer Staatsangehöriger, in Zug | member of the board of directors | joint signature at two |
| 2  |    |    | Hirsig, Daniel, von Amsoldingen, in Pratteln | member of the board of directors | joint signature at two |
|    | 3  | 5  | Urbino, Pilar, amerikanische Staatsangehörige, in Zug | member of the board of directors | joint signature at two |
| 5  |    | 6m | Fedier, Irene Elizabeth, von Zürich, in Schindellegi | director | joint signature at two |
|    | 6  |    | Galicot, Gregorio, amerikanischer Staatsangehöriger, in San Diego (US) | president of the board of directors | single signature |
|    | 6  |    | Fedier, Irene Elizabeth, von Zürich, in Schindellegi | member of the board of directors | joint signature at two |
| 6  |    |    | Galicot, Rafael, amerikanischer Staatsangehöriger, in San Diego (US) | Authorized signatory | single agent signature |
| 7  |    |    | MOORE STEPHENS ZUG AG (CH-170.3.032.113-3), in Zug | auditor | |

The information above is given with no commitment and is in no way legally binding. Only the company record (extract) issued and certified by the competent Registery Office and the text published in the Swiss Commercial Gazette are binding. Remark: It's possible that some graphic elements (for ex. cancellations) aren't represented correctly by some browsers.

If you have any problem with our web server, please send us an E-mail

Exhibit 5 Page 3

1/24/2011 9:00

# EXHIBIT 6

Approved by OMB
3060–0686

INTERNATIONAL SECTION 214 APPLICATION
FCC FORM 214
FOR OFFICIAL USE ONLY

APPLICANT INFORMATION

Enter a description of this application to identify it on the main menu:
BBG Global A.G. Section 214 Application

1. Applicant

| | | | | |
|---|---|---|---|---|
| **Name:** | BBG Global A.G. | **Phone Number:** | | 41–41–768–1070 |
| **DBA Name:** | | **Fax Number:** | | 41–41–768–1075 |
| **Street:** | Bahnhof Park # 4 | **E–Mail:** | | |
| **City:** | Baar | **State:** | | |
| **Country:** | Switzerland | **Zipcode:** | | – |
| **Attention:** | Mr. Gregorio Galicot | | | |

1

Exhibit 6 Page 2

Page 61

**2. Contact**

|  |  |  |  |
|---|---|---|---|
| **Name:** | Barry A. Friedman | **Phone Number:** | 2023318800 |
| **Company:** | Thompson Hine LLP | **Fax Number:** | 2023318330 |
| **Street:** | Suite 800 | **E–Mail:** | barry.friedman@thompsonhine.com |
|  | 1920 N Street, N.W. |  |  |
| **City:** | Washington | **State:** | DC |
| **Country:** | USA | **ZIpcode:** | 20036    – |
| **Attention:** |  | **Relationship:** | Legal Counsel |

**3. Place of Incorporation of Applicant      Switzerland**

**4. Other Company(ies) and Place(s) of Incorporation**

2

Exhibit 6 Page 3

5. Service Type(s) (check all that apply)
- ☒ Global or Limited Global Facilities–Based Authority (Section 63.18(e)(1))
- ☒ Global or Limited Global Resale Authority  (Section 63.18(e)(2))
- ☐ Individual Facilities–Based Service (Section 63.18(e)(3))
- ☐ Individual Switched Resale Service (Section 63.18(e)(3))
- ☐ Individual Facilities–Based and Resale Service (Section 63.18(e)(3))
- ☐ Switched Services over Private Lines (ISR) (Section 63.16 and/or 63.18 (e)(3))
- ☐ Inmarsat and Mobile Satellite Service (Section 63.18(e)(3))
- ☐ Overseas Cable Construction (Section 63.18(e)(3))
- ☐ Individual Non–Interconnected Private Line Resale Service (Section 63.18(e)(3))
- ☐ Other (Section 63.18(e)(3))

6a. Is a fee submitted with this application?
- ◉ If Yes, complete and attach FCC Form 159.   **If No, indicate reason for fee exemption (see 47 C.F.R.Section 1.1114).**
- ○ Governmental Entity    ○ Noncommercial educational licensee
- ○ Other(please explain):

6b. Fee Classification      CUT – Section 214 Authority

7. Destination Country(ies) (e.g., "Country X", "All international points", "All international points except Country X and Country Y" or "Countries X, Y, and Z only".)      All international points except countries on the FCC's exclusion list, as may be amended from time to time.

3

Exhibit 6 Page 4

Page 63

8. Caption (description of authority requested, e.g., Application for Authority to Provide International Facilities–Based and Resold Services to All International Points Except Country X)

   (If the complete description does not appear in this box, please go to the end of the form to view it in its entirety.)

```
Application of BBG Global A.G. for authority to provide international
facilities-based and resold services to all international points
except countries on the FCC's exlcusion list, as may be amended from
time to time.
```

9. Does the applicant request streamlined processing pursuant to 47 C.F.R. Section 63.12? If yes, include in Attachment 1 a statement of how the application qualifies for streamlined processing.　　◉ Yes　　○ No

10. If applying for authority to provide switched services over private lines pursuant to Section 63.16, provide the required showing in Attachment 1.

Applicant certifies that its responses to questions 11 through 17 are true:

11. If the applicant is a foreign carrier, **or** is affiliated (as defined in 47 C.F.R. Section 63.09(e)) with a foreign carrier, provide in Attachment 1 the information and certifications required by Section 63.18(i) through (m).

12. Does the applicant seek authority to provide service to any destination described in paragraphs (1) through (4) of Section 63.18(j)? If yes, list those destinations in Attachment 1 as a response to question 12.　　○ Yes　　◉ No

4

Exhibit 6 Page 5

Page 64

13. Does the applicant seek authority to provide service to any destinations other than those listed in response to question 12 where it has an affiliation with a foreign carrier? If yes, list those destinations in Attachment 1 as a response to question 13.    ○ Yes    ◉ No

14. [Section 63.18(h)] In Attachment 2, provide the name, address, citizenship and principal business of the applicant's ten percent or greater direct and indirect shareholders or other equity holders, and identify any interlocking directorates.

15. In Attachment 2, respond to paragraphs (d), (e)(3) and (g) of Section 63.18.

16. By checking Yes, the undersigned certifies that neither applicant nor any other party to the application is subject to a denial of Federal benefits that includes FCC benefits pursuant to Section 5301 of the Anti–Drug Act of 1988, 21 U.S.C. Section 862, because of a conviction for possession or distribution of a controlled substance. See 47 CFR 1.2002(b) for the meaning of "party to the application" for these purposes.    ◉ Yes    ○ No

17. By checking Yes, the applicant certifies that it has not agreed to accept special concessions directly or indirectly from a foreign carrier with respect to any U.S. international route where the foreign carrier possesses sufficient market power on the foreign end of the route to affect competition adversely in the U.S. market and will not enter into such agreements in the future.    ◉ Yes    ○ No

5

Exhibit 6 Page 6

CERTIFICATION

| 18. Typed Name of Person Signing (Must be a Corporate Officer) Gregorio Galicot | 19. Title of Person Signing President |
|---|---|
| WILLFUL FALSE STATEMENTS MADE ON THIS FORM ARE PUNISHABLE BY FINE AND / OR IMPRISONMENT (U.S. Code, Title 18, Section 1001), AND/OR REVOCATION OF ANY STATION AUTHORIZATION (U.S. Code, Title 47, Section 312(a)(1)), AND/OR FORFEITURE (U.S. Code, Title 47, Section 503). | |

| 20. 1:    Attachment 1 | 2:    Attachment 2 | 3: |
|---|---|---|

**FCC NOTICE REQUIRED BY THE PAPERWORK REDUCTION ACT**

The public reporting for this collection of information is estimated to average 2.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the required data, and completing and reviewing the collection of information.  If you have any comments on this burden estimate, or how we can improve the collection and reduce the burden it causes you, please write to the Federal Communications Commission, AMD–PERM, Paperwork Reduction Project (3060–0686), Washington, DC 20554. We will also accept your comments regarding the Paperwork Reduction Act aspects of this collection via the Internet if you send them to PRA@fcc.gov.  PLEASE DO NOT SEND YOUR RESPONSE TO THIS ADDRESS.

Remember – You are not required to respond to a collection of information sponsored by the Federal government, and the government may not conduct or sponsor this collection, unless it displays a currently valid OMB control number or if we fail to provide you with this notice.   This collection has been assigned an OMB control number of 3060–0686.

**THE FOREGOING NOTICE IS REQUIRED BY THE PAPERWORK REDUCTION ACT OF 1995, PUBLIC LAW 104–13, OCTOBER 1, 1995, 44 U.S.C. SECTION 3507.**

6

Exhibit 6 Page 7

Page 66

**ATTACHMENT 1**

**APPLICATION OF BBG GLOBAL A.G.**

**Response to Question 9**

This Application qualifies for streamlined processing pursuant to Section 63.12 of the Commission's Rules. As set forth below, BBG Global A.G. ("BBG Global") has no foreign affiliations, has no affiliation with a dominant U.S. carrier whose international switched or private line services BBG Global seeks authority to resell, and does not seek authority to provide switched basic services over private lines to a country for which the Commission has not previously authorized the provision of such services.

**Response to Question 11**

BBG Global provides the following information and certifications as required in Sections 63.18(i) through (m) of the Commission's Rules, 47 CFR 63.18(i)-(m):

(i) BBG Global certifies that it is not a foreign carrier within the meaning of Section 63.09(d) of the Commission's Rules.

(j) BBG Global certifies that it seeks to provide telecommunications services to all global points, except those points on the Commission's Exclusion List.

(k) Not applicable. BBG Global does not have any foreign carrier affiliations.

(l) Not applicable. BBG Global does not have any foreign carrier affiliations.

(m) Not applicable. BBG Global does not have any foreign carrier affiliations.

**Response to Question 12**

Not applicable. BBG Global certifies that it does not seek to provide service to any destination described in Subparagraphs (1) through (4) of Section 63.18(j) of the Commission's Rules.

**Response to Question 13**

Not applicable. BBG Global does not have any foreign carrier affiliations.

163988

Exhibit 6 Page 8

Page 67

## ATTACHMENT 2

## APPLICATION OF BBG GLOBAL A.G.

### Response to Question 14

Pursuant to Section 63.18 (h) of the Commission's Rules, the name, address, citizenship and principal business of the applicant's ten percent or greater direct and indirect shareholders are as follows:

1.  Rafael and Karla Galicot Family Trust
    Rafael Galicot, Grantor
    Suite B
    1658 Gailes Boulevard
    San Diego, California 92154
    47.5% shareholder
    Rafael Galicot is a United States citizen
    Principal Business: Investments in telecommunications entities.

2.  Galicot Nobel Family Trust
    Gregorio Galicot, Grantor
    Suite B
    1658 Gailes Boulevard
    San Diego, California 92154
    47.5% shareholder
    Gregorio Galicot is a United States citizen
    Principal Business: Investments in telecommunications entities.

Other than the foregoing, to the best of the Applicant's knowledge, no other person or entity will directly or indirectly own ten percent (10%) or more of the equity of BBG Global A.G.

### Response to Question 15

BBG Global A.G. has not previously received authority under Section 214 of the Communications Act of 1934, as amended.

BBG Global A.G. is not seeking facilities-based authority provided for in Section 63.18(e)(3) of the Commission's Rules.

163976

Exhibit 6 Page 9

Page 68

# EXHIBIT 7

## TRAFFIC AGREEMENT

This Agreement ("Agreement") is made and entered into as of May _15_, 2003, (the "Effective Date") by and among BBG Holdings, Ltd., a Bermuda corporation ("BBG"), on the one hand, and Benchmark Project Management, s.r.o., Michel Alexiev and Goran Alexiev (collectively, the "Agent"), on the other hand, with reference to the following:

### RECITALS:

WHEREAS, BBG is in the business of providing public telephone services, via operator assisted long distance telecommunications services billed collect, to a calling card, to a credit card or to a third party ( the "Services"), and Agent is in the business of selling services such as the Services; and

WHEREAS, BBG and Agent desire that (i) Agent refers Calls originating from its Customer Base ( the "Traffic") to BBG, (ii) Agent assigns to BBG its beneficial interest in the Service Agreements, and (iii) Agent becomes a sales representatives of BBG.

THEREFORE, in consideration of the promises and the mutual covenants and agreements contained in this Agreement, the parties hereto agree as follows:

### ARTICLE I: DEFINITIONS

In addition to the terms defined elsewhere in the Agreement, the following defined terms shall have the following designated meanings:

"Average Calls" means an average of daily Calls for the preceding 30 days.

"Call Platform" means the location or locations where BBG receives Calls originated by an End User and routes them to the receiving party.

"Call" means an international operator assisted long distance call originating from the Customer Base and terminated through BBG's Call Platform.

"Customer" means a person that has entered into a Service Agreement with Agent.

"Customer Base" means all of the Customers of Agent as listed in Exhibit "A" attached hereto and incorporated herein by this reference.

"End User" means a person who places a Call on a telephone within Agent's Customer Base.

"Law" means all applicable statutes, laws, treaties, ordinances, rules, regulations, orders, writs, injunctions, decrees, judgments, or opinions of any Tribunal

"Person" means any individual or entity.

BBG 10251
ATTORNEYS EYES ONLY

Exhibit 7 Page 2

Page 70

"Service Agreements" means those certain agreements between the Agent and its Customers listed in Exhibit "B" attached hereto and incorporated herein by this reference;

"Tribunal" means any (i) local, state, or federal judicial, executive, administrative, regulatory, or legislative instrumentality, and (ii) private arbitration board or panel.

## ARTICLE II:  ASSIGNMENT AND PAYMENT TERMS

a.    Assignment of Service Agreements. Agent hereby assigns to BBG its beneficial interest under each of the Service Agreements. Commencing upon execution of this Agreement, Agent shall exert its best commercial efforts, jointly with BBG, to cause its Customers to enter into direct agreements for the provision of Services with BBG ("New Agreements"). Agent and BBG agree that it is their intention that these New Agreements shall replace all of the Service Agreements. Pending execution of such New Agreements, Agent shall not amend or terminate any Service Agreement; provided, however, that upon BBG's request and confirmation that the Customer will execute a New Agreement, Agent will cooperate with BBG to terminate the applicable Service Agreement.

b.    Introduction of BBG. In order to accomplish the goals set out in paragraph (a) above, Agent shall introduce BBG to each Customer within two (2) months of execution of this Agreement. The specific dates for such introductions shall be mutually agreed by Agent and BBG.

c.    Sales Representative Agreement. Concurrently with the execution of this Agreement, Agent and its principals, if any, shall enter into a Sales Representative Agreement with BBG in the form of Exhibit "C" attached hereto and incorporated herein by this reference.

d.    Payment. In consideration for Agent's performance hereunder, including without limitation the assignment of its beneficial interests in the Service Agreements to BBG, and in addition to the commissions payable to Agent pursuant to the Sales Representative Agreement, BBG shall pay to Agent up to US$60,000 ( the "Transfer Payment") , payable as follows:

(1)    The sum of US$25,000 upon execution hereof;

(2)    The sum of US$15,000 upon completion of BBG's due diligence investigation of the Service Agreements and the effective assignment thereof, which shall take place on or before;

(3)    The sum of US$10,000 when Average Calls equals 35 and provided that this goal is met on or before August 1, 2003; and

(4)    The sum of US$10,000 when Average Calls equals 45 and provided that this goal is met on or before August 1, 2003.

e.    Minimum Traffic Requirement. Agent acknowledges that the payments provided for herein are expressly contingent upon Agent exercising its best efforts to transfer all Traffic from its Customer Base to BBG, it being understood that the payments under paragraph

BBG 10252
ATTORNEYS EYES ONLY

Exhibit 7 Page 3

Page 71

(d) above will not be due and payable if the Average Calls goals are not satisfied. Provided, however, that the deadlines of section (d) above will be extended in the event of Force Majeure (as defined in the Sales Representative Agreement) for up to 6 months. Attached hereto as Exhibit "D" are the historical Call volumes originating from Agent's Customer Base.

      f.    Technical Assistance. BBG shall provide Agent with reasonable technical assistance, DID numbers and toll free lines to enable Agent to switch the Traffic from the current providers to the BBG Call Platform. Agent shall exert its best reasonable commercial efforts so that within two (2) months from the date of this Agreement all Traffic connects automatically to the BBG Call Platform.

      g.    Offset. BBG may offset from amounts due and payable by BBG hereunder any damages that it incurs as a result of Agent's breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

      h.    Termination. BBG may terminate this Agreement upon notice to Agent if the conditions for payments are not satisfied or if Agent breaches its obligations hereunder. Agent may terminate this Agreement if BBG fails to make the payments required hereunder or otherwise breaches its obligations. In either event, however, there shall be prior written notice of termination, stating the grounds therefor, to the breaching Party and the breaching Party shall have thirty (30) days to cure the alleged default.

      i.    Reimbursement of Payments. If Agent receives any commissions or other payments from Network Communications International Corporation ("NCIC") or Blue Phone Limited in compensation for Traffic processed by either NCIC or Blue Phone Limited after May 1, 2003, prior to the transfer of Agent's Traffic to BBG, Agent shall promptly so advise BBG. In that event Agent shall reimburse BBG for any payments made by BBG under section 2(d) above, but only to the extent of the payments received from NCIC or Blue Phone Limited.

## ARTICLE III: WARRANTIES

      a.    Agent's Representations and Warranties. Agent warrants and represents as follows:

      (1)    Agent has full power and authority to carry on its business as it is now being conducted.

      (2)    This Agreement and all agreements, instruments and documents herein provided to be executed or to be caused to be executed by Agent is (or will be) duly executed by and binding upon, and do not and will not violate any provision of, or constitute a default under, any agreement, law, regulation or judicial order to which Agent is a party or by which it is bound upon execution hereof. Without limiting the generality of the foregoing, Agent warrants that to Agent's knowledge, performance of its obligations hereunder does not and will not violate any law, rule, regulation, or ordinance applicable to the telecommunications services to be provided pursuant to this Agreement.

BBG 10253
ATTORNEYS EYES ONLY

Exhibit 7 Page 4

Page 72

(3)     Each of the Service Agreements to which Agent is a party is valid, binding and in full force and effect in accordance with its terms, and Agent has no current knowledge that any Customer intends to terminate its Service Agreement.

(4)     Agent is not in breach of, or default under, any Service Agreement, and has no knowledge of any breach or anticipated breach of, or default under, a Services Agreement by a Customer.

(5)     Exhibits "A", "B" and "D" attached to this Agreement and incorporated herein by reference, are true, accurate and complete in all respects.

b.     BBG's Representations and Warranties. BBG warrants that it is a corporation duly organized, validly existing, and in good standing under the laws of Bermuda, and has the full power and authority (corporate and otherwise) to carry on its business as it is now being conducted.  BBG's execution of and performance under this Agreement have been duly authorized, and when executed this Agreement shall be a valid and binding obligation of BBG.

### ARTICLE IV:  COVENANTS

a.     Compliance with Laws.  In the course of performing their respective duties under this Agreement, each of BBG and Agent agrees that it will not violate the provisions of any Laws, including, but without limitation, any Law promulgated by in the country in which the Calls are made or terminated, or any other country which has regulatory authority over the provision of the Services.

### ARTICLE V:  INDEMNIFICATION

Agent and BBG (each in this context an "Indemnifying Party") agrees to, and does hereby, indemnify the other party hereto (each, in this context, an "Indemnified Party") and its directors, officers, shareholders, employees, and representatives, against all claims, damages, losses, and expenses, including reasonable attorneys fees and expenses, arising out of or related to (i) a breach by the Indemnifying Party of its representations, warranties, covenants and agreements under this Agreement, or (ii) the willful misconduct or negligent acts, errors or omissions of the Indemnifying Party.

### ARTICLE VI:  MISCELLANEOUS

a.     Headings.  The headings, captions, and arrangements used in this Agreement are for convenience only and do not limit, amplify, or modify the terms of this Agreement.

b.     Notice.  Unless specifically otherwise provided, whenever this Agreement . requires or permits any consent, approval, notice, request, or demand from one party to another, such communication must be in writing (which may be by facsimile transmission or email) to be effective and shall be deemed to have been given on the day actually delivered or, if mailed, on the tenth (10th) calendar day after it is enclosed in an envelope, addressed to the party to be

notified at the address set forth on the signature page hereto, properly stamped, sealed, and deposited in the appropriate official postal service.

    c.    **Survival.** All covenants, agreements, representations, and warranties made in this Agreement, including Agent's rights of commissions, shall survive the expiration of the term or any extension or renewal hereof or any assignment of this Agreement or any of the rights or obligations set forth hereunder.

    d.    **Governing Law.** The parties agree that for their mutual convenience the laws of California shall govern the rights and duties of the parties and the validity, construction, enforcement, and interpretation of this Agreement, without regard to principles of conflicts of laws.

    e.    **Invalid Provisions.** If any provision of this Agreement is held to be illegal, invalid, or unenforceable, such provision shall be fully severable; this Agreement shall be construed and enforced as if such provision had never comprised a part hereof; and the remaining provisions shall remain in full force and effect and shall not be affected by such provision or by its severance. Furthermore, in lieu of such provision, there shall be added automatically a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

    f.    **Entirety and Amendments.** This Agreement represents the final agreement between the parties with respect to the subject matter hereof and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements by the parties. No amendment or variation of the terms of this Agreement shall be valid unless made in writing and signed by each of the parties.

    g.    **Waivers.** No course of dealing nor any failure or delay by either party, or its respective officers, directors, employees, representatives, or attorneys with respect to exercising any right or remedy available to it hereunder shall operate as any waiver thereof under this Agreement. A waiver must be in writing and signed by the waiving party to be effective, and such waiver will be effective only in the specific instance and for the specific purpose for which it is given.

    h.    **Multiple Counterparts.** This Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes and all of which constitute, collectively, one agreement; but, in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

    i.    **Parties Bound; Assignments.** This Agreement is binding upon, and inures to the benefit of the parties hereto and their respective successors and assigns; provided that neither party may, without the prior written consent of the other, assign any rights, duties, or obligations hereunder, and any purported assignment in violation of the foregoing shall be void and ineffective; provided however, that BBG may assign any or all of its rights and obligations hereunder (i) to an affiliated Person that directly or indirectly controls, is controlled by, or is under common control with, BBG, or (ii) in connection with (A) a merger of BBG pursuant to which BBG is not the surviving entity, (B) the purchase by a bona fide third party purchaser (in

BBG 10255
ATTORNEYS EYES ONLY

W97SD-81X0P5\127714.1

Exhibit 7 Page 6

Page 74

one transaction or a series of related transactions) of fifty percent (50%) or more of the outstanding voting stock of BBG, or (C) sale of all or substantially all of BBG's assets.

      j.    Neutral Interpretation. The provisions contained herein shall not be construed in favor of or against either party because that party or its counsel drafted this Agreement, but shall be construed as if all parties prepared this Agreement, and any rules of construction to the contrary.

      k.    Arbitration. In the event of any dispute or disagreement between the parties, the parties shall set forth their respective positions and disagreements in writing and give notice of the same to each other and will exert good faith efforts to resolve the dispute or disagreement. Except as otherwise set forth in this Agreement, if the dispute is not settled at the expiration of fifteen (15) days from the time such notice is received, then the entire matter shall be submitted to binding arbitration. The arbitration shall be conducted in San Diego, California under the Rules of Arbitration of the International Chamber of Commerce, as then in effect, except to the extent that the parties at that time may agree upon other rules. The arbitrator shall be bound to the strict interpretation and observation of the terms of this Agreement. Subject to paragraph l. below, the parties are responsible for their own reasonable attorneys fees and costs incurred by it in connection with the arbitration, but the losing party shall pay the fees and costs of the arbitrator. The arbitrator shall be specifically empowered to grant temporary or permanent injunctive relief as well as any other equitable or legal remedies. The arbitration award shall be final and binding on the parties hereto. Notwithstanding any provision of the aforesaid rules or statutes to the contrary, the refusal or failure of any party to appear at or participate in any hearing or other portion of any arbitration proceeding pursuant to this paragraph k, shall not prevent any such hearing or proceeding from going forward, and the arbitrator is empowered to make a decision and/or render an award ex parte which shall be binding on such party as fully as though such party had participated fully in such hearing or proceeding.

      l.    Attorneys' Fees. In the event of a dispute or litigation as to any terms or conditions of this Agreement, or if a party brings an action or proceeding to enforce or declare any rights herein created, or to bring about or declare the termination, cancellation, or rescission of this Agreement, the prevailing party in such action or proceeding shall be entitled to receive from the other party fees and costs, including attorneys' fees, as a court of competent jurisdiction may deem just and proper.

      m.    Agreement Terms. The parties hereto agree that the terms and conditions of this Agreement, all instruments and agreements to be entered into in connection herewith, and all discussion and correspondence between the parties related to the foregoing shall constitute the confidential information of the parties and shall not be disclosed to any third party in any manner whatsoever, except as may be required by Law.

      n.    Joint and Several Liability. The obligations of Benchmark Project Management, s.r.o., Michel Alexiev and of Goran Alexiev hereunder shall be joint and several.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

NYF-SD-BJ0101267/141

BBG 10258
ATTORNEYS EYES ONLY

Exhibit 7 Page 7

IN WITNESS WHEREOF the parties have executed this Agreement as of the date first above written.

"BBG"                   BBG Holdings, Ltd.

By: _____

Its: _____

Address:   c/o Richard A. Jenkyn
           Codan Services Limited
           Clarendon House,
           2 Church Street
           Hamilton HM DX, Bermuda
           Tel: (441) 299-4961
           Fax: (441) 295-2408


"AGENT"                 Benchmark Project Management, s.r.o.

By: _G. Alexiev_

Its: _Director_

Address: _Strossmayerovo namesti 11_

_170 00 Prague 7_

_Czech Republic_

Goran Alexiev   _____

Michel Alexiev  _____

*[SIGNATURE PAGE TO TRAFFIC AGREEMENT]*

BBG 10257

Exhibit 7 Page 8

Page 76

## EXHIBIT "A"

### LIST OF CUSTOMERS

**Signed up hotels (15)**

| Hotel | Number of rooms |
| --- | --- |
| Ibis | |
| Novotel | |
| Mercure | |
| Adria | |
| Astoria | |
| AVE Hotels (3 hotels) | |
| Diplomat | |
| Parkhotel | |
| Radisson SAS | |
| Savoy | |
| Top Hotel | |
| Crowne Plaza | |
| Grand Hotel Bohemia | |

Prague Airport
Interchange  (Exchange house)

**Closing stage / contracts up for signing 10 hotels**

| Hotel | Number of rooms |
| --- | --- |
| Hilton | |
| Andels | |
| Best Western Kampa | |
| Europe Hotels - 7 hotels | |
| Josef | |
| Olympik Holding - 2 hotels | |
| Palace | |
| Paříž | |
| Praha | |
| Vienna | |

Checkpoint (Exchange house)

BBG 10258
ATTORNEYS EYES ONLY

Exhibit 7 Page 9

Page 77

# EXHIBIT 8

**RBC Royal Bank**

**RBC Visa Infinite Avion**
MR NICOLAS WOOD
STATEMENT FROM JUL 20 TO AUG 19, 2010

| DATE | ACTIVITY DESCRIPTION | AMOUNT($) |
|---|---|---|
| | MR NICOLAS WOOD | |
| AUG 13 | CALL FROM CHINA AUG12 800-608-0575 | $14.94 |
| | Foreign Currency USD 14.00 | Exchange rate 1.067142 |
| AUG 13 | CALL FROM CHINA AUG12 800-608-0575 | $14.91 |
| | Foreign Currency USD 13.91 | Exchange rate 1.067201 |
| AUG 14 | CALL FROM VAL FEE 800-608-0575 | -$0.96 |
| | Foreign Currency USD .95 | Exchange rate 1.010636 |
| AUG 14 | CALL FROM VAL FEE 800-608-0575 | $1.01 |
| | Foreign Currency USD .95 | Exchange rate 1.063157 |
| AUG 14 | CALL FROM CHINA AUG12 800-608-0575 | $66.03 |
| | Foreign Currency USD 61.85 | Exchange rate 1.067592 |
| AUG 14 | CALL FROM CHINA AUG12 800-608-0575 | $112.88 |
| | Foreign Currency USD 105.14 | Exchange rate 1.067526 |
| AUG 14 | CALL FROM CHINA AUG12 800-608-0575 | $70.28 |
| | Foreign Currency USD 65.84 | Exchange rate 1.067436 |

IMPORTANT INFORMATION:

Exhibit 8 Page 2

Page 79

# EXHIBIT 9

# EPPSTEINER & FIORICA ATTORNEYS LLP

| | | |
|---|---|---|
| San Diego | Stuart M. Eppsteiner* | Colorado |
| 12555 High Bluff Drive | Andrew P. Fiorica | 1260 Yellow Pine Avenue |
| Suite 155 | Robert J. Pribish | Boulder, Colorado 80304 |
| San Diego, California 92130 | Brian K. Findley | Tel (877) 480-1500 |
| Tel (858) 350-1500 | Andrew J. Kubik | Fax (858) 350-1501 |
| Fax (858) 350-1501 | Bethsaida Obra-White | |
| | *Also Admitted In Colorado | |
| | www.eppsteiner.com | |

February 3, 2011

## VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED
## VIA UPS – AS TO FOREIGN ADDRESSES

| | |
|---|---|
| BBG Communications, Inc.<br>1658 Gailes Boulevard<br>Suite B<br>San Diego, CA 92154 | BBG Global AG<br>Banhofpark 4<br>6340 Baar, Canton of Zug<br>Switzerland |
| BBG Communications, Inc.<br>c/o The Corporation Trust Company of Nevada<br>311 S. Division Street<br>Carson City, Nevada 89703 | BBG Holdinigs, Ltd.<br>Clarendon House, 2 Church Street<br>Hamilton HM DX<br>Bermuda |

**Re:    Notice of Violation of the California Consumer Legal Remedies Act (California Civil Code Section 1750 _et seq._) Relating to Sale of Telecommunication Services**

To Whom It May Concern:

Our office represents Nicolas Wood, who as you may already be aware, has filed a Class Action Complaint ("Complaint") against BBG Communications, Inc.'s, BBG Global AG's, and BBG Holdings Ltd.'s (collectively hereinafter referred to as "BBG") sale of telecommunication services, on behalf of himself and all others similarly situated.

Pursuant to Cal. Civ. Code § 1782(a)(1), we direct your attention to the enclosed Complaint  filed by Nicolas Wood in Federal District Court for the Southern District of California alleging violations of law by BBG, including Cal. Civ. Code § 1770, subsections (a)(4), (a)(5), (a)(9), (a)(14), (a)(16) and (a)(19).

The Complaint provides a thorough explanation of the facts upon which Nicolas Wood bases his CLRA claims for damages. The allegations incorporated by reference hereto suffice to place BBG on notice of the particular violations of Cal. Civ. Code § 1770, so they are not being repeated here. In sum, Mr. Wood and all others similarly situated have suffered injury as a result of BBG's failure to disclose material information prior to and at the point of sale of its telecommunication services, thus have been damaged.

BBG Communications, Inc.
February 3, 2011
Page 2

By way of this letter, Nicolas Wood hereby makes a demand for corrective action. Specifically, Mr. Wood demands that BBG refund the monies wrongfully obtained from him and all others similarly situated by BBG through its failure to disclose connection fees, unconscionably high per-minute rates, billing policies, and refund policies. Mr. Wood further demands, on behalf of himself and all others similarly situated, that BBG cease from engaging in the methods, acts, and/or practices complained of in the Complaint.

Should BBG fail to satisfy the requirements of Cal. Civ. Code § 1782(c), Mr. Wood will amend the Complaint to include a claim for damages under the Third Cause of Action.

Sincerely,

EPPSTEINER & FIORICA ATTORNEYS, LLP

Stuart M. Eppsteiner, Esq.

AJK/lsh
Enclosures: as stated.

Exhibit 9 Page 3

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

**Eppsteiner & Fiorica Attorneys, LLP**
**12555 High Bluff Drive**
**Suite 155**
**San Diego, CA 92130**

BB6 - 2/3/11 GR

---

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

BBG Communications, Inc.
1658 Gailes Blvd, Ste B
San Diego CA 92154

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery
David Gumpel

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☒ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7009 2250 0003 4989 5746

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

Exhibit 9 Page 4

Page 83

USPS - Track & Confirm

http://trkcnfrm1.smi.usps.com/PTSInternetWeb/InterLabelInquiry.

 **UNITED STATES POSTAL SERVICE**

Home | Help | Sign In

Track & Confirm          FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: 7009 2250 0003 4989 5746
Service(s): **Certified Mail**™
Status: **Delivered**

Your item was delivered at 10:20 am on March 01, 2011 in SAN DIEGO, CA 92154.

**Detailed Results:**

- **Delivered, March 01, 2011, 10:20 am, SAN DIEGO, CA 92154**
- Notice Left, February 07, 2011, 11:24 am, SAN DIEGO, CA 92154
- Notice Left, February 05, 2011, 9:01 am, SAN DIEGO, CA 92154
- **Arrival at Unit, February 05, 2011, 6:34 am, SAN DIEGO, CA 92154**

**Notification Options**

Track & Confirm by email

Get current event information or updates for your item sent to you or others by email. 

---

**Track & Confirm** 

Enter Label/Receipt Number.



---

<u>Site Map</u>   <u>Customer Service</u>   <u>Forms</u>   <u>Gov't Services</u>   <u>Careers</u>   <u>Privacy Policy</u>   <u>Terms of Use</u>   <u>Business Customer Gateway</u>

Copyright© 2010 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

Exhibit 9 Page 5

Page 84

UNITED STATES POSTAL SERVICE

07 FEB 2011 PM 1

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

**Eppsteiner & Florica Attorneys, LLP**
**12555 High Bluff Drive**
**Suite 155**
**San Diego, CA 92130**

BBG - 2/3/11 Demand Ltr.

---

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired. ■ Print your name and address on the reverse so that we can return the card to you. ■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature  X C Bowdey  ☐ Agent  ☐ Addressee  B. Received by (*Printed Name*)  C Bowdey   C. Date of Delivery  2/7/11 |
| 1. Article Addressed to:  BBG Communications, Inc.  c/o The Corporation Trust Company  of Nevada  311 So. Division Street  Carson City, Nevada 89703 | D. Is delivery address different from item 1?  ☐ Yes  If YES, enter delivery address below:  ☐ No |
| | 3. Service Type  ☒ Certified Mail   ☐ Express Mail  ☐ Registered   ☒ Return Receipt for Merchandise  ☐ Insured Mail   ☐ C.O.D.  4. Restricted Delivery? (*Extra Fee*)   ☐ Yes |
| 2. Article Number  (*Transfer from service label*)   7009 2250 0003 4989 5722 | |
| PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540 | |

Exhibit 9 Page 6

Page 85

**From:** UPS Quantum View [auto-notify@ups.com]
**Sent:** Monday, February 07, 2011 1:41 AM
**To:** Lupe Suro Horn
**Subject:** UPS Delivery Notification, Tracking Number 1ZV676340490647963



Pour lire ce message en Français, cliquez ici.
Klicken Sie hier, um diese Nachricht in Deutsch anzuzeigen.

***Do not reply to this e-mail. UPS and Eppsteiner & Fiorica Attorneys LLP will not receive your reply.

**At the request of Eppsteiner & Fiorica Attorneys LLP, this notice is to confirm that the following shipment has been delivered.**

**Important Delivery Information**

_____

**Tracking Number:** 1ZV676340490647963
**Delivery Date / Time:** 07-February-2011 / 10:12 AM

**Delivery Location:** FRONT DESK
**Signature Obtained**

**Shipment Detail**

_____

**Ship To:**
BBG Global AG
4 BAHNHOF PARK
BAAR
6340
CH
**Number of Packages:** 1
**UPS Service:** UPS SAVER
**Shipment Type:** Letter
**Reference Number 1:** 931.001

_____

***Senden Sie keine Antwort auf diese E-Mail. UPS und Eppsteiner & Fiorica Attorneys LLP werden die Antwort nicht erhalten.

Exhibit 9 Page 7

Page 86

1

**Diese Nachricht bestätigt auf Veranlassung von Eppsteiner & Fiorica Attorneys LLP, dass die folgende Sendung zugestellt wurde.**

**Wichtige Zustellinformationen**

**Kontrollnummer:**  1ZV676340490647963
**Zustelldatum/-zeit:** 07-Februar-2011 / 10:12 vormittags

**Zustellort:** FRONT DESK
**Unterschrift erhalten**

**Sendungsdetails**

**Empfänger:**
BBG Global AG
4 BAHNHOF PARK
BAAR
6340
CH
**Anzahl der Pakete:**  1
**UPS Service:**        UPS SAVER
**Versandart:**        Envelope
**Referenznummer 1:** 931.001

***Il est inutile de répondre à ce courrier électronique. UPS et Eppsteiner & Fiorica Attorneys LLP ne recevront pas votre réponse.

**A la demande de Eppsteiner & Fiorica Attorneys LLP, cet avis vous confirme que l'envoi suivant a été effectué.**

**Importantes informations de livraison**

**Numéro de suivi:**        1ZV676340490647963
**Date/Heure de livraison:** 07-Février-2011 / 10:12 AM

**Adresse de livraison:** FRONT DESK
**Signature Obtenue**

**Informations concernant l'envoi**

Exhibit 9 Page 8

Page 87

**Destinataire:**
BBG Global AG
4 BAHNHOF PARK
BAAR
6340
CH
**Nombre de colis:**      1
**Service UPS:**          UPS SAVER
**Type d'envoi:**         Enveloppe Express
**Numéro de référence 1:** 931.001

\_\_\_\_\_2K8ZRR2voiZ4Qj\_\_\_\_

Discover more about UPS:
Visit ups.com

© 2011 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color brown are trademarks of United Parcel
Service of America, Inc. All rights reserved.
For more information on UPS's privacy practices, refer to the UPS Privacy Policy.
Please do not reply directly to this e-mail. UPS will not receive any reply message.
For questions or comments, visit Contact UPS.

This communication contains proprietary information and may be confidential. If you are not the intended recipient, the
reading, copying, disclosure or other use of the contents of this e-mail is strictly prohibited and you are instructed to please
delete this e-mail immediately.
Privacy Policy
Contact UPS

Exhibit 9 Page 9

Page 88

# EXHIBIT 10

Stuart M. Eppsteiner, Esq. SBN 098973
sme@eppsteiner.com
Andrew J. Kubik, Esq. SBN 246902
ajk@eppsteiner.com
**EPPSTEINER & FIORICA ATTORNEYS, LLP**
12555 High Bluff Dr., Suite 155
San Diego, CA 92130
T: 858-350-1500
F: 858-350-1501

Counsel for Plaintiff and the Class

## IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLAS WOOD, individually and on behalf of all others similarly situated,<br><br>          PLAINTIFF,<br><br>     vs.<br><br>BBG COMMUNICATION, INC.,  and BBG GLOBAL AG,<br><br>          DEFENDANTS. | CASE NO.: 3:11-cv-00227-AJB-NLS<br><br>CLASS ACTION<br><br>**CLRA VENUE DECLARATION**<br><br>[Demand For Jury Trial] |

I, Nicolas Wood, declare as follows:

1. I am a named plaintiff in this litigation.

2. I have personal knowledge of the matters set forth below except to those matters stated herein which are based on information and belief, which matters I believe to be true.

3. If called as a witness I could and would competently testify to the matters included herein.

4. I am informed and believe that venue is proper in this Court under Civil Code § 1780(d) based on the fact that the transaction at issue, or a substantial portion thereof, occurred in this district. Furthermore, BBG Communications, Inc. resides in this district.

CLRA Venue Declaration
1

163357

Exhibit 10 Page 2

Page 90

1    5.  I declare under penalty of perjury under the laws of the state of California that the

2    foregoing is true and correct and that this declaration was executed on April 13, 2011 in

3    Vancouver, British Columbia.

By:   _____

Nicolas Wood

CLRA Venue Declaration
2

163357

Exhibit 10 Page 3